Estate of Sam E. Broadhead, Deceased, S. Norris Broadhead and Paul E. Broadhead, Executors, and Verdie Cox Broadhead v. Commissioner.
Estate of Broadhead v. Commissioner
Docket Nos. 79294, 91086, 4015-64.
United States Tax Court
T.C. Memo 1966-26; 1966 Tax Ct. Memo LEXIS 257; 25 T.C.M. (CCH) 133; T.C.M. (RIA) 66026; 25 Oil & Gas Rep. 741; January 28, 1966
DeQuincy V. Sutton, 214 Dixie Towers, Meridian, Miss., for the petitioners. Winfield A. Gartner, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1956, 1958, 1959, and 1960 in the amounts of $19,030.53, $123,983.46, $499,066.30, and $463,389.89, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for our decision the following: 1. With respect to the year 1956: A. Whether losses on the sale of timber which was cut during the years 1955 and 1956 under contracts entered into in 1955 should be apportioned between the two years on the basis of the timber cut in each year or reported in full for the *261 year 1956 when the contracts were completed. B. Whether petitioners are entitled to the standard deduction for the year 1956 or are not entitled to that deduction because of being allowed a deduction for interest paid on Federal income tax deficiencies in an amount greater than the standard deduction, which amount represents at least to the extent of the standard deduction a personal and not a business deduction. 2. With respect to the year 1957 the following issues arise for the purpose of determining the basis of property sold in other years and whether petitioners had a net operating loss to carry back to 1956 since respondent determined no deficiency for this year: A. Whether petitioners are entitled to a deduction for depreciation on machinery used in making capital improvements to timberlands owned by them. B. Whether the amount of $11,664.84 paid by petitioners as State income tax is a proper deduction in arriving at adjusted gross income or is properly deductible only from adjusted gross income. C. What is the proper amount of deduction to which petitioners are entitled as a casualty loss because of damage done to some of their timber and timberlands by a forest *262 fire. 3. With respect to the year 1958: A. Whether amounts totaling $9,636.71 spent by petitioners in connection with certain oil leases are deductible or constitute nondeductible capital expenditures. This same issue is present with respect to payments totaling $123,245.89 in the year 1959 and payments totaling $9,270.07 in the year 1960. B. Whether petitioners' payment of $9,945 in discharge of their guarantee of an obligation of Delta Hardwood Lumber Company resulted in a business or nonbusiness bad debt. C. In computing the profits taxable to petitioners from an installment sale, which they elected to report on such basis, of certain timberlands located in North Carolina, whether the sales price of the property should be reduced by the mortgages assumed by the purchaser in arriving at the contract price for the purpose of determining the applicable gross profit ratio. D. Whether gains realized by petitioners which were reported on the installment basis from the sale of three parcels of land in 1958, referred to as the Togo Island tract, the Arkansas tract, and the North Carolina timberlands, constitute ordinary income or long-term capital gain. This same issue is *263 present with respect to the year 1959 as to further payments which were received in that year from the 1958 sales of these properties and as to sales of Louisiana properties in 1959. [1]
4. With respect to the year 1959: A. When an obligation owned to petitioners by Michael Eubanks in the amount of $46,000 became worthless, were petitioners entitled to a deduction of a business or nonbusiness bad debt? B. Whether petitioners collected the amount of $397,000 of the sales price of the Togo Island tract and the Arkansas tract upon the refinancing of these properties by the purchaser with petitioners' assistance, funds from the proceeds of the new mortgage being used to this extent to discharge a prior mortgage which had been placed on the property by petitioners but assumed by other persons. 5. With respect to the year 1960: A. Whether petitioners had a gain in the amount of $445,411.14 or any portion thereof *264 upon their repossession of Togo Island, the Arkansas lands, and the Avoyelles tract in Louisiana. The determination of this issue requires both the determination of petitioners' basis in the notes secured by the mortgages which were foreclosed on these properties and the fair market value of these properties at the date of foreclosure. B. Whether petitioners are entitled to a deduction for interest paid because of their payment on August 2, 1960, of an installment including $48,419.08 of interest, due by Michael Eubanks on a first mortgage on property on which petitioners had instituted foreclosure proceedings under a second mortgage in July 1960 which resulted in petitioners' repossession of the property subsequent to August 2, 1960, and for $2,966.28 of expenses of the mortgagor which had been advanced by the mortgagee. 6. Whether petitioners sustained a net operating loss in 1957 which constitutes a net operating loss deduction in the year 1956. Findings of Fact Some of the facts have been stipulated and are found accordingly. Sam E. Broadhead (hereinafter referred to as petitioner although he died during the trial of this case and his executors have been substituted as *265 petitioners) and Verdie Cox Broadhead, husband and wife residing in Meridian, Mississippi, filed joint Federal income tax returns for each of the calendar years 1955, 1956, 1957, 1958, 1959, and 1960 with the district director of internal revenue at Jackson, Mississippi. [2]
Sam E. and Verdie Cox Broadhead (hereinafter jointly referred to as petitioners) came to Mississippi in 1939 and from that time until at least the date in 1951 when they sold 26,000 acres of land located in Clarke County, Mississippi, were engaged in sawmill operations. [3]
*266 In 1951 petitioners sold 26,000 acres of timberland located in Clarke County, Mississippi to International Paper Company in order to obtain funds with which to pay an income tax deficiency. After the sale of this land petitioners owned no timber acreage until later in that year when they began to acquire various timberlands. After the sale of the 26,000 acres of timberlands in 1951, petitioners began to acquire other timberlands. The following schedule shows the purchases and sales of timberlands by petitioners as reflected on their income tax returns, together with the purchase price, sales price, and persons to whom sold, to the extent these facts appear in the record, during the years 1955 through 1960: Date of
Date
Land
sale
acquired
Cost
Sale price
Vendee
Ben Green Tract
George Cy., Miss.; Greene
Masonite Corp.
Cy., Miss.
1955
"Lands in Mississippi"
George Cy.; Greene Cy.;
Jones Cy.; Jackson Cy.
1956
1953
$ 64,384.70
$ 469,285.00
Eubanks
(+ 27,500 )
Waterloo Dairy
Jan. 10,
Mississippi Products,
Claiborne County, Miss.
1957
1955
246,709.95
85,556.62 [1]
Inc.
Arkansas Lands
Prairie Cy.; Monroe Cy.;
Craighead Cy.; Lonoke
Cy.; Crittenden Cy.;
June 13,
1951-
Woodruff Cy.
1958
1956
437,307.08
1,625,000.00
Eubanks
Togo Island
Claiborne, Cy., Miss.; Ten-
sas Parish, Louisiana
1958
1954
256,153.50
462,500.00
Eubanks
North Carolina Lands
Aug. 5,
Pamlico Dev. Co.
Hyde Cy., N.C.
1958
1956
1,266,329.17
2,419,000.00
(Powe group)
McLeod Tract
Tangipahoa Parish, La.
1959
141,076.74
303,750.00
Rebo Land Co.
Avoyelles Tract
July 30,
Avoyelles Parish, La.
1959
1955
1,200,000.00
Eubanks
*267 The Arkansas lands, Togo Island, and the Avoyelles tract were subsequently repossessed from Eubanks as follows: Date
Date of
Date of
Court Order
Foreclosure
Commissioner's or
Land
Entered
Sale
Bid Price
Trustees' Deed
Arkansas lands
July 12, 1960
Aug. 27, 1960
$100,000
Sept. 7, 1960
Togo Island
Tensas Parish, La.
July 1, 1961
July 15, 1961
121,000
July 15, 1961
Claiborne Cy., Miss.
Aug. 5, 1960
10,000
Aug. 5, 1960
Avoyelles tract
Sept. 13, 1960
Nov. 2, 1960
400,000
Nov. 2, 1960
The Arkansas lands and Togo Island were still subject to first mortgages to Connecticut General Life Insurance Company when petitioners foreclosed on their second mortgages. The lands were subjected to the following mortgages or deeds of trust during the years here in issue: Date
Amount of Lien
Mortgagor [1]
Mortgagee [1]
Arkansas Lands
Dec. 1, 1954
$ 200,000.00
Broadhead
Florida Real Estate
Covered part of the tract only.
Loan Co.
Aug. 1, 1957
425,000.00
Broadhead
Conn. Gen. Life Ins.
(Modified
Co.
Oct. 15, 1957)
Oct. 30, 1957
825,000.00
Broadhead
Conn. Gen. Life Ins.
Second mortgage for $825,000
Co.
loan secured primarily by
N.C. lands.
June 14, 1958
1,525,000.00
Eubanks
Broadhead
Land remained subject to
1957 mortgages to Conn.
Gen.
Jan. 7, 1959
1,825,000.00
Eubanks
Conn. Gen. Life Ins.
Togo Island is also security.
Co.
Jan. 10, 1959
1,139,833.64
Eubanks
Broadhead
Second to mortgage of Jan.
7, 1959. Togo Island is also
security. Replaced mort-
gage of June 14, 1958.
Togo Island
1958
175,000.00
Broadhead
Sawyer Group
Jan. 7, 1959
1,825,000.00
Eubanks
Conn. Gen. Life Ins.
Arkansas Lands are also se-
Co.
curity.
Jan. 10, 1959
1,139,833.64
Eubanks
Broadhead
Second mortgage to Jan. 7,
1959 mortgage. Arkansas
lands are also security.
North Carolina Lands
Oct. 30, 1957
825,000.00
Broadhead
Conn. Gen. Life Ins.
and
Co.
425,000.00
July 9, 1958
940,000.00
Powe Group
Broadhead
Second to 1957 mortgage to
Conn. Gen Life Ins. Co.
Replaced mortgage of July 9,
Jan. 14, 1959
1,337,000.00
Powe Group
Broadhead
1958.
Avoyelles Tract
Dec. 1, 1955
275,000.00
Broadhead
Mortgage Investment
Corp.
July 30, 1959
1,175,000.00
Eubanks
Broadhead
*268 Facts with Respect to the 1955-1956 Timber Cutting Contract On May 23, 1955, petitioners entered into a purchase contract for all merchantable timber on certain land in Louisiana (hereinafter referred to as the Mack Pope tract) for $250,000 plus agents' fees of $2,412.57. On August 15, 1955, petitioners executed a sales contract with Charles L. Rogers, providing for a deposit and prescribed settlement terms, and giving to Rogers the right to cut all merchantable pine cypress on the Mack Pope tract, the timber to be paid for by Rogers as cut. On October 22, 1955, petitioners entered into a contract with Johnie Rogers and Tom Forbes under the terms of which Johnie Rogers and Tom Forbes were to cut the merchantable hardwood timber located on this same tract, the timber to be paid for as cut under terms similar to the terms of the contract with Charles L. Rogers. During 1955, petitioners received under both contracts a total amount of $119,362.87 in settlement for 2,734,451 feet board measure of timber. During 1956 petitioners received under both contracts a total amount of $124,467.88 in *269 settlement for 2,800,969 feet board measure of timber. Petitioners claimed a loss on their 1956 Federal income tax return from these two timber-cutting contracts in the total amount of $33,581.82, but at the trial agreed that this amount was in error and the total loss under the two contracts was $8,581.82. Respondent takes the position that this total loss is applicable to the years 1955 and 1956 on the following basis: Year
Board feet
Receipts
Depletion
Loss
1955
2,734,451
$119,362.87
$124,690.97
$5,328.10
1956
2,800,969
124,467.88
127,721.60
3,253.72
Total
$243,830.75
$252,412.57
$8,581.82
Facts with Respect to Petitioners' Claimed Standard Deduction in 1956 Petitioners on their 1956 Federal income tax return deducted as a business expense interest paid of $73,247.34. Respondent in his notice of deficiency disallowed the standard deduction of $1,000 claimed by petitioners with the explanation that inasmuch as petitioners deducted personal interest of several thousand dollars paid on a Federal income tax deficiency and also claimed a standard deduction of $1,000, they had been given the most advantageous election *270 of itemized deductions and the standard deduction of $1,000 had been disallowed. Facts with Respect to Depreciation Deduction in 1957 In 1956 petitioners purchased two draglines for a total amount of $38,519 for use in ditching and improving a certain tract of land in Hyde County, North Carolina, which they had purchased in 1956. The draglines were needed for use in ditching on the property as preparation for logging a marshy area. In a mortgage placed by petitioners on the Hyde County, North Carolina property in October 1957, the following provision appears: Grantor shall at all times keep upon the property described in this instrument at least one dragline which is in good operating condition and which has a capacity of at least 5/8 cubic yard. Said dragline shall be continuously engaged during normal working hours in the construction of canals and roadways of a type which conform to the standard practices in the locality. Normal and ordinary work stoppages for repairs, or stoppages occasioned by Acts of God, shall not constitute a default hereunder. Petitioners on their income tax return deducted as an expense the cost of freight and monthly installments paid on the two *271 draglines. Respondent disallowed this deduction and determined that the draglines were a capital asset with a salvage value of $8,000 and a useful life of 5 years, resulting in depreciation during the year 1957 of $6,103.80. Respondent determined that the depreciation on the two draglines should be capitalized and added to the cost of the land being improved. Petitioners now concede that the $6,103.80 as determined by respondent is the proper amount for depreciation on these two draglines in 1957 but contend that this amount of depreciation is a deductible expense in that year and is not to be capitalized and added to the land cost. Deductibility of State Income Taxes Paid by Petitioners in 1957 During 1957 petitioners paid $11,664.84 of deductible State income taxes. Petitioners did not claim this deduction on their 1957 Federal income tax return. Respondent concedes that the amount is deductible and the only issue is whether it is deductible in arriving at adjusted gross income or is deductible only from adjusted gross income. Proper Deduction for Casualty Loss in 1957 In August 1957 a forest fire swept a portion of the North Carolina timberlands purchased by petitioners *272 in 1956. The total acreage of the land which petitioners purchased in North Carolina in 1956 was 73,493 acres, and as of August 1957 petitioners' basis in the total property was $1,264,206.23. The timber area affected by the fire was approximately 10,000 acres with some additional acres of salt marsh area adjacent to the timber area also being affected. United States Highway 264 divided the acreage which was affected by the August 1957 forest fire. One portion of the affected acreage was located northwest of that highway and the other portion was located southeast of the highway. The northwest parcel of land affected by the fire contained approximately 4,400 acres. The southeast portion of the land affected by the fire comprised approximately 5,700 acres and a portion of this acreage was marshland that did not support a stand of timber. In connection with the purchase of this same North Carolina property from petitioners in 1958 by the Powe interests, E. Wheeler Bryant, who has managed, bought, and sold timberlands in Mississippi for approximately 48 years and is a registered consulting appraiser of timberland, inspected this property in approximately July of 1957 before the August *273 fire and he inspected it again in 1958 after the fire had occurred. The purchase price paid for the entire 73,493 acres in 1958 was $2,419,000, and the purchasers considered the value of the timber on the average as being the equivalent of from $25 to $30 per acre in determining the purchase price they were willing to pay. The timber cruise of this acreage in 1956 showed 91 million feet of standing timber. The timber on the acreage which was burned was all pine, primarily Pond pine, although the tract as a whole contained other timber. Approximately 70 million board feet of the timber on the total North Carolina tract was pine, 20 million board feet was hardwood and cypress, and 1 million board feet was juniper. The timber growth on the acreage affected by the fire was about average for the tract as a whole. Not all of the timber on the acreage swept by the fire was killed. On the acreage northwest of Highway 264 all of the merchantable timber was destroyed on 1,600 acres and approximately 60 percent of the timber was destroyed on the balance of the acreage. Approximately 50 percent of the timber on the portion east and south of the highway was killed. Since the 1957 fire some *274 new growth of timber has developed on the burned area, but on approximately 600 acres no new growth has appeared. This 600 acres was subjected to ground and subsurface fire which destroyed certain of the organic materials in the soil making it useless for growing timber. It was not economically feasible to salvage the damaged timber which was burned but not completely destroyed on the acreage affected by the fire in 1957 because the location of the acreage and the burned timber thereon was such that the cost of that operation would exceed the value of the timber salvaged. Petitioners on their income tax return for 1957 reported loss of timber on the 10,000 acres affected by the fire on the basis of $15 per acre cost and loss of land for the same acreage on the basis of $2.84 per acre, showing a total casualty loss of $178,400. The fair market value of the portion of petitioners' land affected by the fire in 1957 was approximately $200,000 greater before the fire than after the fire. Respondent determined that as of the date of petitioners' purchase of the North Carolina property in 1956 the fair market value of the pine timber thereon was $15 per thousand board feet, the fair *275 market value of the hardwoodand cypress timber thereon was $10 per thousand board feet, the fair market value of the juniper thereon was $30 per thousand board feet, the fair market value of the land itself was $5 per acre, and the fair market value of the young growth on the land was $2.50 per acre. In accordance with this determination respondent allocated petitioners' basis in the North Carolina tract between land, young growth, and timber as follows: Fair market
Allocated
Basis
value
basis
per acre
Land (73,493 acres at $5)
$ 367,465.00
$ 252,306.73
$ 3.43
Young growth (73,493 acres at $2.50)
183,732.50
126,153.00
1.72
Timber
1,290,000.00
885,733.00
12.05
$1,841,197.50
$1,264,192.73
Respondent determined that the fire in Hyde County destroyed the equivalent of 2,425 acres of merchantable timber having a basis to petitioners of $29,221.25 and 3,000 acres of young growth having a basis to petitioners of $6,192, making a total casualty loss as determined by respondent of $35,413.25. Petitioners now apparently do not contest respondent's method of computing the casualty loss but claim a loss from the fire of $114,582, *276 which is composed of a cost of 600 acres of land which suffered organic soil destruction of $3.47 per acre for a total of $2,082, and a cost of pine timber on the basis of $15 per acre determined on a basis of 1,000 board feet per acre of Pond pine with 6,000 acres being a total loss and 3,000 acres a 50 percent loss. Deductibility of Amounts Spent in Connection with Oil Leases in 1958, 1959, and 1960 Sometime prior to 1958, petitioner had commenced purchasing certain oil and gas rights. In 1958 petitioners expended amounts in connection with certain drilling leases. Of the expenditure, $486.71 represented expenses for maps and recording of leases and other miscellaneous expenditures in connection with leases and $9,150 represented the payments made at the time the leases were entered into with respect to 18 separate leases of terms ranging from 5 years to 10 years carrying provisions for payment of delay rentals if drilling were not commenced in the first year of the term of the lease. The largest payment of the 18 leases was with respect to a lease executed on December 4, 1958, between petitioner and the Board of Supervisors of Clarke County, Mississippi, the payment being in *277 the amount of $3,200. The following language appeared in this lease: THIS AGREEMENT made this 4th day of December 1958, between the Board of Supervisors of Clarke County, Mississippi, Lessor (whether one or more) whose address is: Quitman, Mississippi and Sam Broadhead, Meridian, Mississippi, Lessee, WITNESSETH: 1. Lessor in consideration of THREE THOUSAND TWO HUNDRED AND NO/100 Dollars ($3,200.00), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in Clarke County, Mississippi, to-wit: * * *
2. Subject to the other provisions herein contained, this lease shall be for a term of six years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or lands with which *278 said land is pooled hereunder. 3. The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase, in either case such interest to bear its proportion of any expense of treating unmerchantable oil to render it merchantable as crude; (b) on gas, including cashinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; where gas from a gas well is not sold or used, Lessee may pay as royalty $100.00 per well per year and if such payment is made it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; and (c) on all other minerals mined and marketed, *279 one-tenth either in kind or value at the well or mine, at Lessee's election, except that on sulphur mined and marketed, the royalty shall be fifty cents (50") per long ton. Lessee shall have free use of oil, gas, coal, wood and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used. Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling thereon out of any surplus gas not needed for operations hereunder. * * *
5. If operations for drilling are not commenced on said land or on acreage pooled therewith as above provided on or before one year from this date the lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay or tender to Lessor or to the credit of Lessor in Bank of Quitman at Quitman, Mississippi (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of SIX HUNDRED FORTY AND NO/100 *280 DOLLARS ($640.00), herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment or tender of rental may be made by the check or draft of Lessee mailed or delivered to Lessor or to said bank on or before such date of payment. If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank, or for any reason fail or refuse to accept rental, Lessee shall not be held in default or failure to make such payment or tender of rental until thirty (30) days after Lessor shall deliver to Lessee a proper recordable instrument, naming another bank as agent to receive such payment or tenders. The down cash payment is consideration for this lease according to its terms and shall not be allocated as mere rental for a period. Lessee may at any time or times execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions *281 of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases. Most of the remaining 17 leases entered into between various individuals and petitioner in 1958 with respect to which the remaining portion of the total sum of $9,636.71 was paid contained provisions similar to those quoted above. In 1959 petitioners also expended amounts in connection with various mineral leases, which included $113,738.60 paid out at the time certain leases in Clark County, Wayne County, and Amite County, Mississippi, and Avoyelles Parish, Louisiana, were entered into. In addition to the $113,738.60 payments which petitioners deducted in computing their taxable income, they also claimed a deduction of $9,507.29 "mineral lease expense" in connection with these leases. In 1960 petitioners expended $28,495.26 in connection with the acquisition and retention of mineral rights leases. Of this amount, $9,270.07 represented payments at the time the following *282 leases were acquired: Term of
lease in
Delay
Lessor
Amount
Acres
years
rental
Ocie McDaniel
$1,925.00
220
1
0
Cascade Petroleum
562.50
90
5
$ 45.00
Ellis McDaniel, et al) [1]
2,066.84
120
1
0
J. D. Kennedy
49.5
3
12.38
St. Helena Parish leases (4)
1,592.71
754.87
5
1.00 per acre
R. T. Jackson
1,600.00
80.00
10
80.00
W. E. Christian
1,540.00
154.00
10
154.00
[2] $9,287.05
The leases, with the exception of the four St. Helena Parish, Louisiana leases and the deletion of the delay rental provisions as noted, contained provisions similar to those contained in the lease with the Board of Supervisors of Clarke County, Mississippi, quoted heretofore. The St. Helena Parish, Louisiana leases contained the following provisions: THIS AGREEMENT, entered into effective as of February 10, 1960, by and between JOHNNIE B. LEE, once married and then to Miss Ruth Lee, nee Lee, with whom he is living and residing, Address: Osyka, Mississippi, Route 2, herein called "Lessor" *283 (whether one or more) and J. E. Stack, Jr., and Sam E. Broadhead, of Meridian, Mississippi, hereinafter called "Lessee", witnesseth, that: Lessor, in consideration of the sum of Ten Dollars & other valuable considerations ($10.00), hereby leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for, and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession, storage and transportation of said minerals (either from said land or acreage pooled therewith), and the right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including the right to construct, maintain and use roads, pipelines and/or canals thereon for operations hereunder or in connection with similar operations on adjoining land, and including the right to remove from the land any property placed by Lessee thereon and to draw and remove casing from wells drilled by Lessee on said land; the land to which this lease applies and which is affected hereby being *284 situated in St. Helena Parish, Louisiana, and described as follows, to-wit: * * *
This lease shall be for a term of five years and no months from the date hereof (called "primary term") and so long thereafter as oil, gas or some other mineral is being produced or drilling operations are conducted either on this land or on acreage pooled therewith (or with any part thereof), all as hereinafter provided for; all subject to the following conditions and agreements: 1. This lease shall terminate on February 10, 1961, unless on or before said date the Lessee either (1) commences operations for the drilling of a well on the land, or on acreage pooled therewith (or with any part thereof), in search of oil, gas or other minerals and thereafter continues such operations and drilling to completion or abandonment; or (2) pays to the Lessor a rental of One and No/100 Dollars ($1.00) per acre for all or that part of the land which Lessee elects to continue to hold hereunder, which payment shall maintain Lessee's rights in effect as to such land without drilling operations for one year from the date last above mentioned; and Lessee may continue to maintain the rights granted without drilling *285 operations for successive twelve months' periods (during the primary term) by paying Lessor, on or before the beginning of such respective periods One and No/100 Dollars ($1.00) per acre for all or that part of the land held hereunder. Payments may be made to the Lessor or may be mailed or delivered for deposit to Lessor's credit in the Bank of Greensburg, Greensburg, Louisiana, which Bank or its successor shall continue to be the depository for such rentals as the representative of Lessor and Lessor's successors and assigns; and the death or incapacity of Lessor shall not terminate or affect Lessee's right to continue to deposit all payments in said depository bank or its successor. The mailing of the check or draft of Lessee or Lessee's successors to Lessor at the address set forth above or to said Bank on or before the rental paying date shall be considered as payment of rental and operate to maintain Lessee's right in force and effect. Should said Bank fail or liquidate, or if it should for any reason fail or refuse to accept Lessee's check or draft, the attempted payment in the manner above provided shall not be thereby rendered ineffective and Lessee shall not be in default for *286 failure to pay said rental until thirty (30) days after Lessor shall have furnished Lessee with a recordable instrument naming a new depository; and this provision shall apply to all such new and subsequently named depositories. Wherever used in this lease, "operations for drilling", "drilling operations" and "operations" shall be deemed to have been commenced when work is commenced or materials placed on the ground at or near the well site preparatory to the drilling of a well. * * *
7. Subject to the provisions of Paragraphs 2 and 10 hereof the royalties to be paid by Lessee are: (a) on oil (which includes condensate and other liquid hydrocarbons when separated by lease separator units), one-eighth (1/8) of that produced and saved from the land and not used for fuel in conducting operations on the property (or on acreage pooled therewith or with any part thereof), or in treating such liquids to make them marketable; (b) on gas, one-eighth (1/8) of the market value at the well of the gas used by Lessee in operations not connected with the land leased or any pooled unit containing all or a part of said land; the royalty on gas sold by Lessee to be one-eighth (1/8) of the amount *287 realized at the well from such sales; (c) one-eighth (1/8) of the market value at the mouth of the well of gas used by Lessee in manufacturing gasoline or other by-products, except that in computing such value, there shall be excluded all gas or components thereof used in lease or unit operations, or injected into subsurface strata as hereinafter provided; (d) One Dollar ($1.00) for each ton of 2240 pounds of sulphur, payable when marketed; and (e) one-eighth (1/8) of the market value at the well or mine of all other minerals produced and saved or mined and marketed. Oil royalties shall be delivered to Lessor free of expense at Lessor's option in tanks furnished by Lessor at the well or to Lessor's credit in any pipe line connected therewith. In the event Lessor does not furnish tanks for such royalty oil and no pipe line is connected with the well, Lessee may sell Lessor's such oil at the best market price obtainable and pay Lessor the price received f.o.b. the leased property, less any severance or production tax imposed thereon. Lessee shall have the right to inject gas, water, brine or other fluids into subsurface strata, and no royalties shall be due or computed on any gas or *288 component thereof produced by Lessee and injected into subsurface stratum or strata through a well or wells located either on the land or on a pooled unit containing all or a part of the land. Petitioners on their income tax returns for each of the years 1958, 1959, and 1960 claimed deductions as business expenses of the amounts expended with respect to the various leases acquired. Respondent disallowed $9,636.71, $123,245.89, and $9,270.07 for the years 1958, 1959, and 1960, respectively, with the explanation that such amounts were expenditures in acquiring leases which should be capitalized. Delta Hardwood Lumber Corporation Bad Debt In the latter part of 1953 petitioner was considering commencing, during 1954, cutting timber from acreage he owned in Arkansas through two operating companies which were Delaware corporations of which he was the sole stockholder, Delta Oak Flooring Company and Quitman Veneer Company. Petitioner submitted his plan to respondent on November 30, 1953, and received a ruling that the gains from such an operation would be recognized as capital gains from the sale of timber. Petitioner did not go through with the plan in accordance with the proposal *289 of November 30, 1953, but in 1957 petitioner wrote the district director of internal revenue that he then proposed that a Delaware corporation owned by his children and financed by him, Delta Hardwood Lumber Corporation (hereinafter referred to as Delta) would operate a sawmill for the production of timber from his land. In 1957, at the time the letter was written to the district director of internal revenue, the sawmill was nearing completion and the plan contemplated that Delta would produce lumber to be sold exclusively through the Wells Lumber Company (hereinafter referred to as Wells) of Montgomery, Alabama. Wells was to advance money to Delta to enable it to produce the lumber and be repaid from the lumber as it was produced. Petitioner guaranteed repayment of advances from Wells to Delta and, in accordance with this guarantee, in 1958 paid to Wells $9,945 consisting of $9,000 principal repayment and $945 of interest. Petitioners on their 1958 income tax return deducted the $9,945 paid to Wells in accordance with petitioner's guarantee of advances by Wells to Delta with the following explanation: Loss by payment of note and interest guaranteed by taxpayer as a step in sale *290 of extensive timber stands owned by taxpayer. Respondent in his notice of deficiency disallowed the claimed deduction of $9,945 with the explanation that the loss sustained by petitioners by reason of petitioner's having paid the obligation of Delta, of which he was the guarantor, was a nonbusiness bad debt, to be considered as a short-term capital loss. Proper Computation of Profits on Installment Sale of North Carolina Tract During 1958, petitioners sold three parcels of land as heretofore set forth in the schedule of their purchases and sales of land. The Togo Island tract which had been purchased by petitioners in 1954 for $256,153.50 and which consisted of approximately 6,100 acres in Louisiana and 640 acres in Mississippi, was sold by petitioners February 1958 to M. J. Eubanks (hereinafter referred to as Eubanks) for a total consideration of $462,500. This sale was made subject to an outstanding mortgage held by Adele Sawyer, James E. Sawyer, and Susan Mason (hereinafter referred to as the Sawyer group) in the approximate amount of $175,000, which debt was not assumed by Eubanks. During 1958 collections on the sale of the Togo Island property totaled $87,364.51. At the *291 date of the sale of this property by petitioners to Eubanks, petitioners' basis in the property was $236,725.14, representing its initial cost to petitioners less a casualty loss claimed and allowed in the amount of $19,428.36. During the years 1951 through 1956 petitioners had purchased tracts of land located in Arkansas consisting of a total of approximately 21,528.35 acres as heretofore set out in the schedule of petitioners' purchases and sales of land. This property is referred to as the Arkansas tract. There was outstanding on one of these tracts consisting of approximately 14,280 acres, a mortgage of approximately $200,000 securing an indebtedness of petitioners to the Florida Real Estate Loan Company, the note evidencing the indebtedness being dated December 1, 1954. In October 1957, petitioners borrowed $825,000 from Connecticut General Life Insurance Company (hereinafter referred to as Connecticut General) for which their personal note was given secured by a first mortgage on the North Carolina tract. Petitioners borrowed $425,000 from Connecticut General, giving therefor their personal note secured by a first mortgage on the Arkansas tract. The first mortgage on the *292 North Carolina tract was, by its terms, also a second mortgage on the Arkansas tract, and the first mortgage on the Arkansas tract was, by its terms, also a second mortgage on the North Carolina tract. A portion of the $1,250,000 so borrowed by petitioners was used to pay the remaining balance on the note given by petitioners at the time of purchase of the North Carolina tract which was held in 1957 by Central Standard Life Insurance Company of Chicago. After payment by check of Connecticut General of this balance which was in the amount of $859,444.51, the remaining portion of the $1,250,000 borrowed by petitioners was disbursed by Connecticut General as follows: $161,821.11 was used to pay the balance due on the original note of $200,000 given by petitioners to Florida Real Estate Loan Company secured by deed of trust on a portion of the Arkansas tract, $3,490 was used to pay attorneys' fees, and the residue of $225,244.38 was disbursed to petitioners. On July 13, 1958, petitioners sold the Arkansas tract to Eubanks for a total consideration of $1,625,000. Of this purchase price, $1,525,000 was discharged by a note from Eubanks to petitioners, secured by a deed of trust covering *293 the Arkansas tract. The Arkansas tract had cost petitioners $437,307.08, which was petitioners' basis in the tract at the date of sale. Collections on the sale of the Arkansas tract at the date of sale totaled $70,915.03. Petitioners incurred deductible legal expenses of $8,100 and other expenses of $60 in connection with this sale in 1958. On August 5, 1958, petitioners sold the North Carolina tract to W. A. Powe, Bryant, and their associates (hereinafter referred to as the Powe group) for $2,419,250. As a part of the sales agreement, the Powe group assumed petitioners' outstanding mortgage indebtedness to Connecticut General aggregating $1,250,000 consisting of the two notes and mortgages of $825,000 and $425,000 described heretofore. The Powe group made a down payment of $229,250 and gave petitioners a note in the amount of $940,000 secured by a mortgage on the North Carolina tract. Petitioners on their income tax return for the year 1958 reported total gain on the sale of the North Carolina tract of $1,152,930.83 arrived at by subtracting from the selling price of $2,419,000 a basis of $1,266,329.17. Respondent in his notice of deficiency increased petitioners' basis in *294 the property by the amount by which he decreased the casualty loss which had been claimed by petitioners with respect to the property in 1957, made certain other adjustments to basis not here in issue, and arrived at a corrected gross profit to be realized of $1,013,986.38. Petitioners, in computing the gain ratio to be applied to the collections in 1958 from the sale of the North Carolina tract, used a percentage of 47.6, which was the percentage that their total computed gain was of the total selling price. Respondent in his notice of deficiency computed a profit percentage of 86.72 by subtracting from the total selling price of $2,419,250 the mortgages assumed by the buyers of $1,250,000, arriving at a contract price of $1,169,250, and computing the percentage that the total gross profit to be realized (or total gain as referred to by petitioners) was of this computed contract price. He also recomputed the profit percentage on the Togo Island and Arkansas properties but petitioners offered no evidence and made no argument that there is error in these computations except to state that they do not agree with the method used by respondent. Whether Petitioners Were in the Trade *295 or Business of Selling Timberlands Petitioners made the various purchases and sales of timberlands as heretofore set out including the three sales in 1958, the details of which are heretofore described, which are the only sales of timberlands in this year disclosed by the record. The record discloses no purchases of timberlands in 1958 or 1959 by petitioners. Petitioners in 1959 sold a tract of timberlands they had acquired from the Sawyer group and on which there was outstanding an indebtedness of $250,000. The record discloses no sales of timberlands by petitioners in 1960. In 1951 petitioners had sold the 26,000 acres of timberlands on which they had conducted a sawmill operation, in order to pay an asserted income tax deficiency. They then began to attempt to acquire a substantial amount of timber acreage which they hoped to increase to 100,000 acres of land debt free on which to continue to pursue sawmill operations. During the years 1954 through 1957 petitioners were also considering having wholly-owned corporations or corporations owned by their children enter into cutting contracts to cut the timber on certain of their timberlands. During the years here in issue petitioners *296 sold varying amounts of timber. The sales made to Eubanks in 1958 were at the insistence of an individual employed by Eubanks who approached petitioners about the sale. Among the provisions of the deed from petitioners to Eubanks conveying the Arkansas property sold to him in 1958 were the following: Sam Broadhead and his wife * * * hereby sell, convey, transfer and warrant, subject to the hereinafter stated conditions, limitations and/or reservations, unto M. J. Eubanks, and unto his heirs and assigns forever, the following described lands lying * * * in the State of Arkansas
* * *
TO HAVE AND TO HOLD the foregoing unto said grantee and unto his heirs and assigns forever, subject to the foregoing, and hereinafter stated conditions, limitations and/or reservations. There are two deeds of trust or mortgages outstanding against the described property * * * in favor of Connecticut General * * * These deeds of trust or mortgages contain limitations and provisions as to the cutting and removal of timber * * * Same shall be considered as a part hereof and abided by grantee herein. Further, there is outstanding a document styled "Supplemental Agreement" * * * Terms thereof shall *297 be carried out. It is contemplated that authority to cut timber from the described lands will be obtained from Connecticut General Life Insurance Company aforesaid and from grantors herein, and that timber shall only be cut strictly in accord with the terms of deeds of trust or mortgages aforesaid and supplemental agreement thereto, and further, only on and under terms set forth herein. Area or areas shall be determined for the cutting of timber, and permission in writing from grantors and Connecticut General * * * before cutting of timber on any designated area begun * * * [Such] area shall be cut according to good forestry practices, and in workmanlike manner, all trees on such area which will produce a log 10 feet long with 10 inch tip shall be cut, and always trees cut shall be taken into the top so long as log 10 feet long with 10 inch tip can be cut. While cutting of timber is in progress on the described lands, and until the entire purchase price hereby required to be made has been paid in full, grantee shall pay adequate competent log scalers and checkers who shall be designated or approved, in writing, by grantors, and without expense to grantors. These log scalers *298 and checkers shall make reports each week to grantors of all timber cut from the described premises, furnishing a copy of their report to grantee. These log scalers and checkers shall be employees of grantee, and he shall pay their salaries, their social security payments, and carry workmen's compensation as to them. * * *
Timber cut from described lands shall be paid for on basis of $25.00 per thousand feet for stumpage for tupelo gum, cypress, ash and hackberry, and $20.00 per thousand feet for stumpage on all othed species. The mortgage from Eubanks to Broadhead given at the time of the sale in 1958 contained substantially these same provisions. The sale made to the Powe group was at the insistence of Bryant who approached petitioners about the sale. Petitioner's financial situation in 1958 was such that he was having difficulty meeting the charges, such as property taxes and interest on indebtedness, with respect to the various properties, particularly the North Carolina tract. Petitioners reported the gains from the sales of the three tracts in 1958 and from the sale of the property sold in 1959 on the installment basis as capital gains. Respondent in his notice of deficiency *299 determined that the gains from the sales of these tracts were ordinary income. Claimed Bad Debt Deduction for the Eubanks' Loan In July 1959 petitioners sold Eubanks a sawmill in Arkansas for $100,000 and lent him $50,000 with which to commence operation of this mill. Eubanks gave petitioners a note dated July 8, 1959, for the $150,000 to be repaid commencing July 15, 1959, at a minimum rate of $1,000 a week until the principal and 3 percent interest was paid in full. This note was secured by a deed of trust on the sawmill and certain timberlands in Mississippi. During 1959 Eubanks repaid to petitioner $4,000 of the $50,000 advance to be used in operating the sawmill. When Eubanks defaulted on payment of the loan, petitioners foreclosed on the sawmill to effect payment of the $100,000, but found that the timberlands on which they held the deed of trust to secure their loan were subject to a prior mortgage given by Eubanks to another lender who had previously foreclosed, and they were therefore unable to collect the remaining $46,000. Petitioners deducted the $46,000 on their 1959 income tax return as a business bad debt. Respondent recognized that the $46,000 constituted *300 a bad debt but allowed it only as a nonbusiness bad debt deductible as a short-term capital loss. The Additional Collection of $397,000 in 1959 on the Togo Island and Arkansas Tracts Sometime late in 1958 Eubanks, with petitioner's assistance, negotiated with Connecticut General with respect to rearranging his indebtedness with respect to the Arkansas and Togo Island properties which he had purchased from petitioners in 1958 for the respective amounts of $462,500 and $1,625,000. Included as a portion of the rearrangement of Eubanks' indebtedness was also the financing of a tract of approximately 14,000 acres of timberland located in Arkansas and a timberland lease which Eubanks had arranged to purchase from E. A. Stewart Lumber Company, which properties are hereinafter referred to as the Stewart tract and the Pickthorne lease. The total consideration which Eubanks was to pay for the Stewart tract and Pickthorne lease was $635,491.95. The total amount of the loan to Eubanks by Connecticut General was to be $1,825,000. The security for the $1,825,000 was to consist of a first mortgage on the Togo Island tract, the Arkansas tract, the Stewart tract, and the Pickthorne lease. Since *301 there already existed a first mortgage on the Togo Island tract running to the Sawyer group, and a first and second mortgage on the Arkansas tract running to Connecticut General, as well as mortgages on both of these tracts securing the note given by Eubanks to petitioners in connection with the 1958 purchases of the properties, it became necessary to rearrange all of this indebtedness to complete the entire transaction. The first mortgage on the Arkansas tract which ran to Connecticut General had been given by petitioners to secure $425,000 which petitioners had borrowed from Connecticut General, which mortgage the Powe group had agreed to assume as a part of the purchase price of the North Carolina tract. Payment had been made by the Powe group on this mortgage so that as of February 1959 when the rearrangement of indebtedness was effected there remained an outstanding principal balance on this mortgage of $397,000 and interest of $12,505.50 was due on the principal balance. Since the agreement to assume the $425,000 first mortgage to Connecticut General on the Arkansas tract, which amount was also a second mortgage on the North Carolina tract, had been considered as a part of *302 the purchase price of the North Carolina tract by the Powe group, it became necessary, if this mortgage to Connecticut General was to be paid out of funds other than moneys of the Powe group, for the Powe group to replace in some manner this portion of the purchase price of the North Carolina property, since as a result of the transaction the Powe group would owe to Connecticut General on their mortgage assumptions in connection with their purchase of the North Carolina property only $773,000, consisting of the $825,000 first mortgage on the North Carolina property which they had assumed less $52,000 which the Powe group had paid thereon in 1958. At the time of the rearrangement, the Powe group owed to petitioners on the note given to them at the time the North Carolina property was purchased the amount of $940,000. This note for $940,000 was to be paid to petitioners by annual installments of principal of $156,000 with a stated annual required interest payment. The Powe group was being released from $397,000 of indebtedness to Connecticut General assumed by them as part payment to petitioners for the North Carolina property, because of that amount of the proceeds from the loan by *303 Connecticut General to Eubanks being used to pay off the principal amount of the first mortgage on the Arkansas properties which was also a second mortgage on the North Carolina property then held by Connecticut General. The Powe group agreed to and did execute a new note to petitioners for $1,337,000, replacing the $940,000 note given in part payment of the North Carolina property plus the $397,000 of indebtedness from which they were released. This new note was to be repaid by annual payments of principal of $175,000 plus interest as provided therein. As consideration for petitioner's assistance inthe rearrangement of indebtedness with respect to the Arkansas and Togo Island tracts, Eubanks agreed to increase the sales price of those tracts by $106,500. The proceeds of the $1,825,000 lent to Eubanks by Connecticut General secured by the first mortgages on the Togo Island, Arkansas, and Stewart tracts, and the Pickthorne lease were disbursed as follows: E. A. Stewart Lumber Company
$ 635,491.95
Sawyer group (Payment first mortgage on Togo Island tract,
$112,635.49 represents principal, balance interest)
115,057.80
Abstract
9,496.90
Connecticut General ($397,000 principal on Arkansas tract
mortgage, $12,505.50 interest)
409,505.50
Connecticut General
132.34
Connecticut General
1,484.25
Tensas Parish, Louisiana (tax on Togo)
878.87
Claiborne County, Mississippi (tax on Togo)
292.90
Miscellaneous taxes
136.62
Title search
123.24
Delinquent tax
9.93
Commercial Investment Company (Assigned by Eubanks to
satisfy his debt to Commercial Investment Co.)
100,200.00
Balance to borrower (Paid by Eubanks to petitioners)
377,189.70
Connecticut General (For timber cut)
175,000.00
Total amount of loan
$1,825,000.00
*304 Petitioners entered this transaction on their journal as follows: Note (1958) on Arkansas unpaid
$1,525,000.00
Note (1958) on Togo (after oil well credit)
437,500.00
$1,962,500.00
Add: Price increase for resale 1959
107,000.00
Total debt due by Eubanks on resale
$2,069,500.00
Deduct: Payment of vendor lien on Togo
112,635.49
Transfer to Powe etc. to Ark. first mortgage
397,000.00
Interest paid by Eubanks to Conn. Gen. to
date of resale
12,505.50
Price concession on resale
500.00
522,640.99
Balance: New note, excluding separate (3) notes
1,546,859.01
Less: Cash paid on resale
377,189.70
30,000.00
407,189.70
Balance for settlement
$1,139,669.31
Add: 2 days of interest excessively paid Conn.
Gen.
164.33
Balance: Note of Eubanks
$1,139,833.64
Eubanks gave to petitioners a new note for $1,139,833.64 secured by mortgages on the Togo Island and Arkansas properties as well as the Stewart tract and the Pickthorne lease. These mortgages provided for payment to petitioners and to Connecticut General, the first mortgagee, of the proceeds of timber cut from the land. Petitioners on their tax returns for the years *305 1959 and 1960 treated the $397,000 payment made by Eubanks to Connecticut General by disbursement from the proceeds of his loan from Connecticut General to pay the mortgage which the Powe group had agreed to assume, as a refinancing of the purchase of the North Carolina tract; and when petitioners received the Powe group's first payment of $175,000 on the new note in 1960 (the payment due in 1959 having been extended to 1960), they reported the entire $175,000 on their tax return as a collection of principal on the North Carolina property instead of reporting only $156,000 of the $175,000 payment as a collection of principal on the North Carolina property. Respondent in his notice of deficiency to petitioners considered the $397,000 as an additional payment on the Togo Island and Arkansas properties, computed as follows: Collections reported: Arkansas property
$ 488,991.28
Togo Island
115,888.79
Collections not reported: Arkansas property and Togo
Island tract
397,000.00
Total
$1,001,880.07
Profit ratio
70.7404
Gain on collection
$ 708,733.97
Adjustment of gain
$ 292,461.78
Gain on Repossession of Togo Island and Avoyelles Parish Properties *306 in 1960 During the year 1960 Eubanks defaulted on the payment due petitioners on the $1,139,833.64 note secured by mortgages on the Togo Island, Arkansas, and Stewart tracts and the Pickthorne lease and also on the note given upon the purchase of the Avoyelles Parish tract in 1959 which was secured by a mortgage on that tract. After the default, petitioners commenced foreclosure proceedings on all four of these properties. The foreclosures with respect to all except the Louisiana portion of the Togo Island tract were completed in 1960. The foreclosure proceedings with respect to the Arkansas property resulted in the Chancery Court for the Lake District of Craighead County, Arkansas, entering a decree on July 12, 1960, reciting that of the note executed by Eubanks to petitioners in payment of certain lands conveyed to him by petitioners in the original amount of $1,139,833.64, there remained an unpaid principal balance of $1,063,098.01 with interest accrued to date of $57,724.24 and that if the sum together with an allowance of attorneys' fees of $5,000 with interest at 6 percent from the date of entry of the decree were not paid within 10 days, the Clerk of the Court for the Lake *307 City District of Craighead County, Arkansas should advertise the property to be sold at public auction at the front door of the Courthouse. In the decree it was also noted by the Court that the note for $1,139,833.64 also covered and affected land in the States of Mississippi and Louisiana, which were not included in the Court's decree, the decree of the Court only covering the Arkansas land. The sale provided for in the order of July 12, 1960, was held on August 27, 1960. Under date of September 7, 1960, petitioners received a Commissioner's Deed to all the Arkansas lands which were the subject of the mortgage guaranteeing the payment of the Eubanks' note. This deed confirmed the sale to petitioners of all these lands for the sum of $100,000 subject to the prior lien of Connecticut General. This deed recited that the bid by petitioners of $100,000 was the highest bid received upon the offering of the property for sale at public auction in accordance with the decree and that this sale had been approved by the Chancery Court. Under date of August 5, 1960, petitioner received a Trustee's Deed to the Claiborne County, Mississippi land which he had purchased at the trustee's sale on *308 August 5, 1960, which sale was in foreclosure of the deed of trust from Eubanks to secure his note to petitioners in the amount of $1,139,833.64. The deed recited that the highest bid for the property was in the amount of $10,000 by petitioners and also recited that the deed was subject to the outstanding mortgage which Connecticut General held on this property. Under date of November 2, 1960, petitioners received a Sheriff's Deed to the Avoyelles Parish, Louisiana property which recited that after this property had been exposed to public sale according to law petitioners became the purchasers thereof for the sum of $400,000. Attached to the Sheriff's Deed was an appraisal by an appraiser appointed by the Sheriff which valued the property at $575,000. The Sheriff's sale was made in accordance with an order of the Twelfth Judicial District Court, Parish of Avoyelles, State of Louisiana which recited that Eubanks' indebtedness to petitioners secured by a mortgage on this property was in the amount of $1,175,000. The decree was entered with respect to a petition filed by petitioners on September 1, 1960, which petition recited various demands made by petitioners upon Eubanks prior to *309 the date of the filing of the petition as well as payment by petitioners of taxes on the property which petitioners recited Eubanks failed to pay and further recited that payments due January 15, 1960, and thereafter on the note had not been made. The terms of the sale of the Avoyelles Parish property as shown in the Sheriff's Notice of Sale, were "Cash, with benefit of appraisement, subject to that certain mortgage" which petitioner had given on December 1, 1955 to Mortgage Investment Corp. in the original amount of $275,000. The Mortgage Certificate prepared by the Deputy Clerk of the Court on search of the mortgage records of Avoyelles Parish, Louisiana, showed that there remained due on this mortgage the sum of $175,000 on November 2, 1960, the date of the foreclosure sale. Foreclosure proceedings were commenced by petitioners with respect to the Louisiana portion of the Togo Island tract during 1960, but were not completed until July 15, 1961, when petitioners bid the property in at a foreclosure sale for $121,000. The Louisiana portion of the Togo Island tract consists of approximately 6,100 acres. In 1961 petitioners conveyed the Arkansas property including the Stewart tract *310 and Pickthorne lease back to Eubanks for a total stated price of $2,850,000, but the property was repossessed within a 12-month period. Petitioners on their 1960 income tax return reported no gain on the repossession of the Togo Island (Claiborne County, Mississippi), Arkansas, and Avoyelles Parish properties. Respondent in his notice of deficiency determined that petitioners had a gain on the repossession of these properties in a total amount of $445,411.14 consisting of a gain of $229,242.56 on the Togo Island and Arkansas properties and $216,168.58 on the Avoyelles Parish, Louisiana property. Respondent computed the gain on the Togo Island, Arkansas and Avoyelles Parish properties, as follows: Togo Island and Arkansas repossession gain: Fair market value of Togo Island $40 per acre: 6,740 acres at $40
$ 269,600.00
Fair market value of Arkansas properties $40 and $50 per acre: 4,000 acres at $40
160,000.00
36,000 acres at $50
1,800,000.00
Total fair market value these properties
$2,229,600.00
Less: Balance owed on mortgage
1,528,400.00
Fair market value of petitioners' equity
$ 701,200.00
Contract price January 10, 1959
$2,085,579.47
1959 Collections
1,001,880.07
Unpaid balance
$1,083,699.40
Recognized gain in unpaid balance (profit ratio.707404)
766,613.29
Unrecovered basis
$ 317,086.11
Add: Additional costs incurred;
Foreclosure expense
29,060.72
Payment to Connecticut General Life Ins. Co. Aug.
2, 1960
125,810.61
471,957.44
Gain on foreclosure, Togo Island and Arkansas (as above)
$ 229,242.56
Avoyelles Parish, Louisiana repossession gain: Fair market value of Avoyelles property
$ 629,900.00
Contract price
$1,202,250.00
Less. 1959 collection thereof
27,250.00
Unpaid balance
$1,175,000.00
Less: Recognized gain in unpaid balance (profit ratio
.649407)
763,053.58
Unrecovered basis
$ 411,946.42
Add: Payment to Marcus DuPuy (erroneously charged
to Togo, etc. foreclosure)
1,785.00
Basis to recover
$ 413,731.42
413,731.42
Gain on foreclosure, as above
$ 216,168.58
*311 Deduction of $48,419.08 Interest and $2,966.28 of Expenses in 1960 In connection with the foreclosure of the Arkansas properties and the Mississippi portion of Togo Island, petitioners were required to make payments which Eubanks had failed to make on January 15, 1960, on the first mortgage due to Connecticut General, the total amount of this payment being $128,787.15. It consisted of principal due on January 15, 1960, of $77,401.79, interest due of $48,419.08 and $2,966.28 of expenses which Connecticut General had paid for Eubanks. This payment was made on August 2, 1960, after the filing of petitioner's complaint in the Chancery Court for the Lake City District of Craighead County, Arkansas, and the entry of that Court's decree that unless Eubanks' indebtedness to petitioners was paid within 10 days, the property would be sold at public auction, but prior to the sale of the Arkansas property to petitioners on August 27, 1960, or the sale of the Mississippi property to petitioners on August 5, 1960. Petitioners deducted the $48,419.08 as interest paid and the $2,966.28 of expenses. Respondent in his notice of deficiency disallowed the claimed deductions with the explanation *312 that the $2,966.28 was nondeductible but an addition to basis of property, and the $48,419.08 amount represented interest "on another taxpayer's indebtedness and is not deductible in your return; rather such amount, which was another item included in the above-mentioned check to Connecticut General Life Insurance Company for $128,787,75, * * * is to be given consideration as a part of foreclosure cost." Opinion Years of Loss Under Timber Cutting Contracts Performed in 1955 and 1956 Section 611(a) of the Internal Revenue Code of 1954[4] provides that in the case of timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion. Respondent's regulations, section 1.611-1(a), provide that in the case of standing timber the depletion allowance shall be computed solely upon the adjusted basis of the property, and section 1.611-1(b) provides that annual depletion deductions are allowed only to the owner of an economic interest in standing timber, defining an economic interest to be the interest possessed in every case in which the taxpayer has acquired by investment any interest in standing timber and secures by *313 any form of legal relationship income derived from the severance of the timber to which he must look for a return of his capital. This regulation further provides that no depletion deduction shall be allowed the owner with respect to any timber that he has disposed of under any form of contract by virtue of which he retains an economic interest in such timber, if such disposal is considered a sale of timber under section 631(b) or 631(c). Section 631(b) provides that in the case of the disposal of timber held for 6 months before such disposal under a contract by virtue of which the owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. The date of disposal of such timber shall be deemed to be the date the timber is cut except at the election of the taxpayer where payment is made prior to the cutting of the timber. *314 Under either of these sections, and the facts are not sufficient to show with any clarity which would be applicable to petitioner with respect to the cutting which took place in 1955, the recovery of costs is by way of a depletion allowance or a completed sale of the timber at the date it is cut or paid for with the depletion basis considered as the cost of the timber sold. The allowable deduction in either event is for the timber as it is removed. The contracts here show that petitioner was to be paid from the timber as severed and that petitioner did have a capital investment in the timber. The yearly depletion allowance is based on the timber severed in each year and petitioner has shown no facts to show that respondent's computation of yearly depletion allowances in the instant case is not correct or any reason why receipts received from the sale of the timber should not be reported in the year received and the depletion applicable to such timber deducted in that year. Petitioners argue that the timber cutting contracts were speculative with respect to receipts and petitioners had no gain or loss until the final completion of the contract, citing *315 Morton Liftin, 36 T.C. 909 (1961), aff'd 317 F. 2d 234 (C.A. 4, 1963) and Estate of Clarence W. Ennis, 23 T.C. 799 (1955). In the Morton Liftin case we held that a taxpayer who purchased speculative monthly payment notes at a discount was not required to report a pro rata portion of each payment of principal as income but did not realize taxable income until his basis in the notes had been recovered. In Estate of Clarence W. Ennis, supra, we held that a highly speculative agreement to pay did not constitute payment in property to a cash basis taxpayer but that such a taxpayer did not have reportable income from the sale which was the subject of the payment agreement until actual payments had been made in excess of his basis. This type of case has no relevance to sales of timber as cut under timber cutiing contracts with a retained interest. Under such contracts the seller is entitled to recover his basis in the timber through a depletion deduction or an allocated portion of his depletion basis as the timber is severed. Petitioner has failed to show any facts which show error in respondent's determination that depletion is the method *316 for recovery of his basis in this timber. We sustain respondent in his determination in this regard. Standard Deduction for 1956 Petitioners take the position that all of the $73,247.34 interest which they deducted on their 1956 income tax return is a business expense deduction and not a personal expense, and therefore they are entitled to that deduction as well as the $1,000 standard deduction. Petitioners rely on James J. Standing, 28 T.C. 789 (1957), aff'd. 259 F. 2d 450 (C.A. 4, 1958), and Frank Polk, 31 T.C. 412 (1958), aff'd. 276 F. 2d 601 (C.A. 10, 1960). In James J. Standing, supra, we held that interest accrued in 1951 by a taxpayer reporting his income on an accrual basis, on deficiencies for the taxable years 1945 through 1949, which deficiencies arose from adjustments of business income, was deductible as a business expense. In so holding, we stated at page 795 that the taxpayers "had a trivial amount of personal income not derived from the businesses but we have pointed out in our Findings of Fact that the asserted deficiency was based on adjustments of business income." In *317 Frank Polk, supra, in determining that interest paid on an income tax deficiency arising from a prior year was properly deductible as a business expense in computing a net operating loss carryover we followed our holding in James J. Standing, supra.In the Frank Polk case, the deficiency with respect to which the interest was paid arose from a reevaluation of the taxpayer's livestock inventory and the facts showed that during all of the periods pertinent in that case the taxpayers were engaged in the business of raising livestock. In the Frank Polk case, we distinguished Guignard Maxcy, 26 T.C. 526 (1956), in which we held that interest accrued and paid on deficiencies in personal income tax was not deductible as a business expense from gross income for the purpose of computing a net operating loss pointing out that in Guignard Maxcy, supra, we had found that the taxpayer had failed to carry his burden of showing that the interest payment was with respect to his business. In our opinion in *318 Guignard Maxcy, supra, we stated that the interest expense accrued entirely on the taxpayer's personal income tax obligation which he did not pay when due. While respondent argues that our holdings in the James J. Standing and Frank Polk cases are legally incorrect, he, in addition, points out that in the instant case petitioners have failed to show that the adjustments to income from which the deficiencies with respect to which the interest was paid arose were not entirely with respect to personal income or at least with respect to personal income to such an extent that over $1,000 of the interest paid would be with respect to deficiencies from adjustments of personal and not business income. We agree with respondent that petitioners have totally failed to show what adjustments caused the deficiencies with respect to which the interest was paid and therefore in this case, as in Guignard Maxcy, supra, petitioners have failed to sustain their burden of proof. We therefore sustain respondent in his disallowance of petitioners' claimed standard deduction for the year 1956. Depreciation Deduction in 1957 For the year 1957 petitioners reported a loss on *319 their income tax return as filed. Respondent has determined no deficiency for the year 1957, but in the notice of deficiency, determined that petitioners sustained a loss in 1957. In spite of this fact issues are raised in the petition as to the year 1957 and the parties argue those issues as if the year were in issue. There is an assignment of error by petitioners as to respondent's failure to allow a loss carryback to 1956 from 1957 which will be discussed subsequently. Also, petitioners sold property in 1958, including the North Carolina tract on which the draglines involved in this issue were used, and for this reason it is necessary that the basis of that property be determined. Whether the 1957 issues relate to the property basis issues or the loss carryback issues is not made clear by the parties. Why the parties are taking the positions they do with respect to the issues in 1957 is not readily apparent to the Court. As will be subsequently discussed, it appears highly improbable that any net operating loss which might be shown, when all the issues herein are disposed of, to have been sustained by petitioner in 1957 would result in a tax reduction in 1956 because of the large *320 amount of capital gains reported by petitioners in that year. To treat the depreciation on the draglines as an addition to the basis of the North Carolina property which is the position respondent argues is correct, would increase petitioners' basis in that property and therefore decrease the gain derived when petitioners sold the property in 1958. Nevertheless, respondent takes the position, relying on his Revenue Ruling 59-380, C.B. 1959-2, page 87, and section 1.263(a)(2) of his regulations, that the $6,103.80 of depreciation sustained on the draglines in 1957 should be added to the basis of the North Carolina property and petitioners take the position that it is a proper deduction in computing 1957 income under the provisions of section 167(a)[5] allowing as a deduction depreciation on property used in the trade or business or property held for the production of income. *321 Respondent cites no case in support of his contention, and the only case cited by petitioner is Mechanics & Merchants Bank v. United States, 164 F. Supp. 246 (Ct. Cls. 1958), which held that the taxpayer there involved was entitled to deduct depreciation on buildings which he used as rental property for the production of income even though the buildings were originally acquired with the intention of demolishing them in order to make a parking area. How the holding in the Mechanics & Merchants Bank case relates to the issue here involved, petitioners do not state. We see no relevance in the holding in that case to the entirely different factual circumstances here present. Petitioners here have made no showing that the draglines were being used by them for the production of income in 1957. After considering all the facts in the record on this issue, we sustain respondent's position because of petitioners' failure of proof without deciding whether respondent's Revenue Ruling 59-380, supra, is a proper interpretation of the law. The only showing in this record with respect to the use of the draglines is that they were used in ditching and improving petitioners' *322 North Carolina property and that a provision was contained in a mortgage on that property in 1957 that a dragline be maintained at all times on the property and be continuously engaged in the construction of canals and roadways. Respondent n making his determination of the deficiency in petitioners' income tax for 1958 determined that petitioners' North Carolina property was held by petitioners for sale to customers in the ordinary course of their trade or business. Respondent's position with respect to the depreciation deduction in 1957 appears to be inconsistent with his determination as to 1958 since if the draglines were being used in improving property which was held by petitioners for sale to customers in the ordinary course of their trade or business, the draglines would be no different from any machinery used to work on property which is held for sale to produce ordinary income. However, as we discuss subsequently, we have concluded that the North Carolina property was not held by petitioners for sale to customers in the ordinary course of petitioners' trade or business. Petitioners' argument consists to a large extent of the following statement: "Since the property itself *323 is a business asset, it's depreciation is a business function." The record shows that petitioners acquired the North Carolina property with a view of either selling the timber thereon or having the timber cut for the use of sawmills owned by corporations the stock of which they or their children owned. Because of the high costs of holding the property, petitioners sold it before any timber had been sold or logged. While petitioners were actually selling timber on their Arkansas property or having it logged for use in the sawmill operated by their children's corporation in 1957, they had not been in any such operations on the North Carolina property. It might be speculated that this property was being developed to be used in the future in the petitioners' trade or business of selling timber or of having timber cut for use in a sawmill operation which they owned or controlled. However, petitioners have totally failed to show that this development had progressed to the point of being a trade or business engaged in during 1957. Whether respondent's Revenue Ruling 59-380, supra, could be reconciled with our holding in *324 Great Northern Railway Co., 30 B.T.A. 691, 707-708 (1934), we need not decide. Respondent neither in his brief herein nor in Revenue Ruling 59-380, supra, discusses our holding in that case that depreciation on equipment employed by a taxpayer in constructing facilities as a part of its regular operations was deductible under a provision of the Revenue Act applicable to the year there in issue which contained substantially the same language as section 167(a) of the Internal Revenue Code of 1954. In that case we stated: * * * In the deficiency notice the respondent states that the amounts in question are disallowed for the reason that such accounting is analogous to that made for transportation for investmentcredit and cites Great Northern Ry. Co., 8 B.T.A. 225, in which we said: "In our opinion, a part of the wear and tear of the train equipment of the rails, ties, etc., may be properly capitalized when men and materials for construction work are transported in transportation service trains." There is no citation of this case in respondent's brief, and apparently he no longer regards it as authority for the ruling now under *325 review. In our opinion the equipment employed by the petitioner in its construction work was used by its owner in a trade or business. This satisfies the conditions of the statute. In the instant case petitioners have totally failed to show that they were in any trade or business of improving timberlands. We sustain respondent on this issue because of petitioners' failure of proof. Whether State Income Tax Is a Proper Deduction in 1957 In Arriving at Adjusted Gross Income Both parties agree that petitioners are entitled to a deduction in 1957 of $11,664.84 paid by them as State income taxes. The parties stipulated that the "sole issue is whether this amount represents a proper deduction from adjusted gross income, or a deduction in arriving at adjusted gross income." [6]
In the recent case of Douglas H. Tanner, 45 T.C. 145 (1965), on appeal (C.A. 4, Jan. 6, 1966) we held that the taxpayer was not entitled to deduct State income taxes in arriving at adjusted *326 gross income. We discussed our holding in James J. Standing, supra, and Elmer Reise, 35 T.C. 571, aff'd. 299 F. 2d 380 (C.A. 7, 1961) but did not consider those cases controlling with respect to the deductibility of State income tax in computing adjusted gross income. In accordance with our holding in Douglas H. Tanner, supra, we sustain respondent's position that petitioners' State income tax is deductible only from adjusted gross income and not deductible in arriving at adjusted gross income. In the instant case petitioners have not shown that the State income taxes paid in 1957 were paid with respect to 1957 income. The State income tax returns for neither 1956, 1957, nor any other year are in evidence, and petitioners' Federal income tax return for the year 1957 reported a loss of $199,915.12 which was subject to a number of adjustments by respondent, after which respondent arrived at a corrected loss for the year 1957 for the purpose of Federal income taxes of $56,329.91. How the deductibility of petitioners' State income tax in 1957 affects any issue we have in this case has not been pointed out to the Court by either party *327 and is not readily apparent. In any event it is certainly not clear that the income taxes paid by petitioners in 1957 were paid with respect to 1957 income and if not for what year they were paid. Therefore, petitioners in the instant case have failed to prove that the State income taxes paid were with respect to business income and we would for this reason sustain respondent's position that the payment is not includable in computing adjusted gross income. The Fire Loss Claimed in 1957 Here, again, it is difficult to understand the positions of the parties. As we stated in the discussion of the claimed deduction for depreciation for the year 1957, there is no deficiency determined for that year. Respondent in the instant case is contending for a much lower deduction for a casualty loss in 1957 than are petitioners. It would appear that since the basis in the North Carolina properties must be reduced by the amount of the casualty loss in 1957, the smaller the deductible casualty loss the higher basis petitioners will have in the property in 1958 when it was sold. The result appears to be a smaller gain upon the sale under respondent's contention than under petitioners'. Nevertheless *328 we will determine the issue as the parties have presented it to us. Both parties recognize that the fair market value of the 10,000 acres damaged by the fire before the fire as compared to its fair market value after the fire is an amount in excess of petitioners' basis in these 10,000 acres. In our findings we have concluded that the reduction in fair market value of the property because of the fire is approximately $200,000. The problem, therefore, is to determine the basis of petitioners in the property destroyed. Respondent takes the position that a separate basis should be assigned to the land and trees, see Bessie Knapp, 23 T.C. 716 (1955), and United States v. Koshland, 208 F. 2d 636 (C.A. 9, 1953). Petitioners, relying on Alcoma Association v. United States, 239 F. 2d 365 (C.A. 5, 1956), originally took the position that they were entitled to deduct the entire difference in the fair market value of the timber on the 10,000 acre tract before the fire and its fair market value after the fire limited only by their basis in the approximately 73,000 acres contained in the entire property. Petitioners do not discuss the application of *329 Alcoma Association v. United States, supra, to the facts here present. It is noted that in the opinion in that case the Court stated at page 368: * * * The same is not necessarily true of a citrus grove, where the destruction of some of the trees throughout the grove, or perhaps of all the trees in a portion of the grove, leaving the rest of the trees productive, might allow for the matching of the destroyed property with particular portions of the "basis"; [footnote omitted] clearly for some kinds of property physical separability means that each portion has its own "basis." Again the Commissioner does not urge this distinction, and we will therefore not explore this possibility. However, on brief petitioners adopt respondent's view of segregating the basis of land destroyed and the timber destroyed but contend that a much greater portion of the property was destroyed than respondent determined. Since the view adopted by petitioners on brief, as we have set forth in our findings, takes approximately the same approach as that taken by respondent as to separability of land and trees damaged, we have decided to accept the methods now advocated by both parties and decide *330 the issue here purely as a question of fact without exploring possibilities not suggested by the parties. It might be noted that a substantial portion of the record in this case consists of testimony by experts on behalf of each party with respect to the amount of fire damage and the proper allocation of basis to the property damage. The opinions were divergent and little purpose would be served in discussing the testimony of the expert witnesses. Suffice it to say that after considering all of the testimony and the qualifications of the witnesses who testified, as well as the other evidence with respect to the fire on petitioners' property we have concluded that the fire damaged 600 acres of petitioners' land to such an extent that it was no longer valuable for the growing of timber and have accepted the allocation of basis in this land of $3.47 per acre as determined by respondent and accepted by petitioners, thus concluding that petitioners suffered a casualty loss with respect to the land of $2,082. We have concluded that it was not economically feasible to salvage the timber killed by the fire and on this basis determined that all of the merchantable timber on 1,600 acres of *331 land was destroyed and that 60 percent of the merchantable timber on 2,800 acres was destroyed by the fire and approximately 50 percent of all the merchantable timber on 5,000 acres of land was destroyed. Petitioners argue for a basis of $15 per acre in the timber with the statement that this was the fair market value of 1,000 board feet of pine timber in 1956 when the land was acquired. How petitioners conclude that this is the basis in their timber is not explained. However, as set forth in our findings, respondent determined a basis of $12.05 per acre in merchantable timber and $1.72 in young growth by allocating the 1956 fair market value of the various timbers and the land to petitioners' total basis in the property. The total so arrived at by respondent is $13.77. However, in arriving at the $12.05 respondent considered cypress and juniper as well as pine, whereas the record shows that the damaged property contained only pine. In an effort to make a reasonable allowance for the use by respondent in his computation for timber other than pine, we have determined that petitioners' basis in the timber per acre was $14 and therefore have applied the $14 to the destroyed timber. The *332 results thus reached are $22,400 for the 1,600 acres on which the timber was totally destroyed, $23,520 for the 2,800 acres on which 60 percent of the timber was destroyed and $35,000 for the 5,000 acres on which 50 percent of the timber was destroyed, or a total basis in the destroyed property of $83,002. We hold that petitioners are entitled to deduct this amount of $83,002 in 1957 as a casualty loss and that the basis of their North Carolina property must be reduced by this amount in computing their gain on the sale of this property in 1958. Deduction of Payments with Respect to Oil Leases in 1958, 1959 and 1960 Respondent takes the position that the payments to various individuals by petitioners under certain oil leases are bonus payments which are capital expenditures not deductible, citing Maureen Fitzsimons, 37 T.C. 179 (1961), and Sunray Oil Co., 3 T.C. 251 (1944), aff'd. 147 F. 2d 962 (C.A. 10, 1945), certiorari denied 325 U.S. 861 (1945). Petitioners take the position that these payments are rental payments for property used in a trade or business to which they have not and are not taking title and in which they *333 are not acquiring an equity, and therefore, are deductible under section 162(a)(2). These payments were, as petitioners contend, made in order to acquire leases and under the leases petitioners were required to take certain action within a year or pay additional amounts, referred to as delay rentals. These rentals were paid in consideration of the leases, and therefore, are what is generally referred to as bonus payments. Even though the bonus payments are in consideration for the leases and to this extent might be referred to as rentals, petitioners received more under the leases than the mere right to enter and occupy. They received the right to explore for and remove minerals which does give them in effect an equity in the property, and, therefore brings the payment outside the definition of rentals under section 162(a)(3). As we stated in Maureen Fitzsimons, supra, this Court has held in a number of cases, and respondent's regulations have for many years provided, that a bonus payment constitutes a capital investment and is not deductible as rent. In that case we distinguished "first year rental payments" in certain leases of public lands with which *334 Revenue Ruling 56-252, cited by petitioner deals, as follows: The cases of United States v. Dougan, 214 F. 2d 511 (C.A. 10, 1954), and Olen F. Featherstone, 22 T.C. 763 (1954), relied on by the petitioner are clearly distinguishable. The courts in both of these cases held the payments therein made deductible as rentals. Those cases involved noncompetitive leases of public lands under the Mineral Leasing Act of February 25, 1920, as amended August 8, 1946, ch. 916, sec. 3, 60 Stat. 951, 30 U.S.C. 226. The Featherstone case also involved leases from State governments under similar State statutes. In those cases the Commissioner contended that first-year rental payments under those leases were in the nature of bonuses and should be capitalized. However, Congress, in the Mineral Leasing Act, supra, had specifically termed certain payments under competitive oil leases "bonuses," while calling the sums with which the courts were concerned "rentals." Further, although the payments in some years were somewhat larger than the payments provided for other, the various annual payments were not grossly disproportionate to each other. *335 In the recent case of Shamrock Oil & Gas Corp. v. Commissioner, 346 F. 2d 377 (C.A. 5, 1965), affirming 35 T.C. 979 (1961), the Court stated in deciding against the contention of the taxpayer therein that it should be permitted to deduct or exclude bonus payments on leases in full from its gross income in the year they are paid the following: Petitioner readily concedes that the decision of the Tax Court is supported by the direct holdings of no less than four Courts of Appeal, including this Court. [Footnote omitted.] However, it contends that Burton-Sutton Oil Co. v. C.I.R., 328 U.S. 25 (1946) overturned this long-established tax treatment, and that this Court has so held in Lambert v. Jefferson Lake Sulphur Co., 236 F. 2d 542 (C.A. 5, 1956). We do not agree. The issue before the Court in Burton-Sutton involved only the question of whether the possessor of a right to a percentage of the net profits from production owned an economic interest in the oil in place and was thus entitled to a depletion deduction. The tax consequences to the lessee-payor of bonus payments, which is the sole issue here, was not before the Court in *336 Burton-Sutton and the opinion there gives no reason to believe that the holding of that case requires the overruling of long-standing Treasury Regulations and prior decisions of the Courts of Appeals pertaining to the treatment of bonus payments. Petitioner place great weight on this Court's decision in Lambert v. Jefferson Lake Sulphur Co., supra, as supporting its contention that it should be allowed to deduct the bonus payments from its gross income, either in full when paid, or in proportionate amounts based on the anticipated productive life of the lease. That case causes some confusion because the Court not only assigned its reasons for affirmance of the district court, but also adopted the district court's conclusions on the grounds assigned by it. In such a case we can only look to the nature of the payments involved. It seems clear that they were, as this Court characterized them, "in the nature of delay rentals," 236 F. 2d 542, 546, rather than bonus payments, although there is dicta to the effect that "even if the payments were installments of a bonus, they were nonetheless deductible." Although the holding that the payments were deductible as *337 delay rentals is sound, to the extent that the dicta may be read as providing the same treatment to bonus payments, it is specifically rejected. In accordance with the holding in the Shamrock Oil & Gas Corp. case and the long line of decisions by this Court and other courts, we conclude that petitioners are not entitled to deduct the bonus payments here in issue in 1958, 1959, and 1960, but that they must be capitalized. We therefore sustain respondent with respect to his disallowance of bonus payments. It should be noted that the only leases which are in evidence in this case are for the years 1958 and 1960. We have in our findings quoted certain of the provisions typical in the leases for these years. These provisions support the conclusion that the payments were bonus payments to obtain all the rights under the leases including the rights to explore for and remove minerals. Petitioners contend that the leases for the year 1959 contained similar provisions but the record is insufficient to support a finding to this effect. However, petitioners have not shown that the leases for the year 1959 did not give them rights which in effect constituted an equity in the property and we *338 therefore have because of petitioners' failure to show otherwise considered that in fact these leases did grant such rights to petitioners. Disallowance of Bad Debt Deduction on Payment of Delta Hardwood Lumber Company Guarantee We have set forth in our findings the circumstances under which petitioners paid an obligation of Delta Hardwood Lumber Company. Delta was owned by petitioners' children and borrowed working capital from Wells Lumber Company in order to operate. Petitioners guaranteed the loan and were required to pay $9,945 under that guarantee. Petitioners make no contention that they are in the business of lending money but do contend that the indebtedness of Delta which they paid was created in connection with their trade or business, and therefore does not come within the definition of nonbusiness bad debt. [7] Petitioners contend that they were financing a mill of Delta in order to have that mill cut their timber and that in so doing they arranged to get Wells to finance the mill and when Delta could not meet its obligation to Wells, petitioners incurred an expense in payment of a business obligation. Petitioners claim that this amount is deductible not as a bad *339 debt but as a business expense. There is some indication in the record that it was petitioners' intent or at least petitioners' hope that Delta would be in a position to cut timber on petitioners' land and that petitioners would enter into various business arrangements with Delta. There is no evidence that it was this reason as distinguished from the fact that Delta was a corporation owned by petitioners' children which caused petitioners to guarantee the loan of Wells to Delta. If petitioners made this guarantee because of their children's interests in Delta, the guarantee would then obviously be for personal and not business reasons. The evidence is far from clear that petitioners' guarantee of the loan was not because of a desire to assist their children. If we assume, as petitioners would have us do even though no proof of the fact is made, that petitioners guaranteed this loan because of their interest in having Delta cut timber on their property, a more difficult problem arises. In Whipple v. Commissioner, 373 U.S. 193 (1963), rehearing denied *340 374 U.S. 858, the Court pointed out that there was the possibility that the loan by the taxpayer there involved to Mission Orange, a tenant in his building, was incurred in that taxpayer's business of being a landlord. If petitioners here are considered as being in the business of cutting timber, a loan which they made to Delta in connection with arranging to have Delta cut their timber might be considered to be proximately related to their business. However, in the instant case, petitioners made no loan to Delta but guaranteed the loan made by others to Delta, and it was from payment under that guarantee that petitioners suffered the loss of $9,945. Such a loss is held to be a loss from a nonbusiness bad debt. See Putnam v. Commissioner, 352 U.S. 82 (1956). *341 After considering all the evidence of record in the instant case with respect to petitioners' guarantee of the loan of Delta, we have concluded that petitioners have failed to establish that the guarantee was so proximately connected with their trade or business as to make the loss resulting therefrom deductible as a business loss or a business bad debt. We therefore sustain respondent in his disallowance of this deduction. Proper Method of Computation of Profit Percentage on Installment Sale of North Carolina Property Respondent takes the position that under the provisions of section 1.453-4(c), Income Tax Regulations, the contract price which is to be used in computing the profit percentage of petitioners' installment sale of the North Carolina property is to be reduced by the $1,250,000 of mortgages which the Powe group agreed to assume consisting of a $825,000 first mortgage on the North Carolina property and a $425,000 second mortgage on that property. Section 1.453-4(c) of the Income Tax Regulations states in this regard as follows: In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the *342 mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and § 1.453-1 through 1.453-7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. * * * A regulation comparable to this one was specifically approved by the Supreme Court in Burnet v. S. & L. Bldg. Corp., 288 U.S. 406 (1933). In Stonecrest Corporation, 24 T.C. 659, 665 (1955), we explained the purpose of so computing the contract price for use in computing the profit percentage as follows: * * * In the case of real property sold on the installment plan where there was a mortgage on the property which the buyer either assumed or took the property subject to, the statutory scheme of returning a portion of each payment as income in the year received did not reach all of the seller's profit, since the total amount of the selling price was not paid over by the buyer to the seller; that portion of the selling price represented *343 by the mortgage was paid by the buyer directly to the mortgagee. To remedy this, regulations were issued by the Commissioner and approved by the Secretary of the Treasury to provide that the amount of the mortgage, to the extent that it did not exceed the seller's basis in the property sold, was not to be considered a part of the "initial payments" or of the "total contract price." * * * The reduction in the total contract price had the effect of increasing the percentage of each installment payment to be returned as income, thereby reaching the entire profit on the sale. * * * In the instant case one mortgage was a first mortgage on the property and the other mortgage was a second mortgage. However, the regulations make no distinction between a first and second mortgage, and neither party argues that any such distinction should be made. Certainly if the view were to be taken that the agreement to assume the $425,000 second mortgage was an agreement to assume a mortgage solely on the Arkansas property on which this was a first mortgage, then the value of this assumption of the mortgage would be an additional receipt of property in payment of the selling price in the year 1958 when *344 the agreement to assume the mortgage was made. Stephen A. Cisler, Jr., 39 T.C. 458 (1962). Petitioners in reporting the sale did not treat the agreement to assume the $425,000 second mortgage as property or a payment in property to any extent received in 1958, and respondent in his notice of deficiency did not so treat it. We therefore sustain respondent in deducting from the selling price the entire $1,250,000 of mortgages on the North Carolina property assumed by the purchasers in arriving at the contract price to be used in computing the profit percentage applicable to installment payments received. The other figure needed to complete the computation of the profit received by petitioners in 1958 from the sale of the North Carolina property is petitioners' basis in the property. The two adjustments in issue with respect to petitioners' basis in this property are the capitalization of depreciation and the amount of reduction because of the casualty loss in 1957. We have heretofore disposed of those issues and a recomputation of petitioners' basis in the property will be necessary in accordance with our disposition of these issues. Gains on the Sale of the Land *345 in 1958 as Ordinary or Capital Gain Section 1221 [8] defines capital asset as all property held by a taxpayer with certain exceptions, one of which is property held for sale to customers in the ordinary course of the taxpayer's trade or business and another is property used in the taxpayer's trade or business. There is much evidence in the instant case which tends to show that the lands sold by petitioners in 1958 and 1959 were used in their trade or business of selling timber. Respondent, however, *346 does not take this position apparently because section 1231 would allow petitioners to treat the gain from the sale as capital gain. In view of the position taken by respondent we will limit our discussion of this issue to the contentions of the parties and thus our determination will be limited to whether petitioners were engaged in the trade or business of selling timberlands. The issue raised by the parties is one of fact and its resolution involves a consideration of many factors, including the purpose of the taxpayer in acquiring the property sold, the frequency, continuity, and substantiality of sales of property, and the extent of the activity on the part of the seller or his agent in improving the property, advertising it for sale and soliciting purchasers. Arthur E. Wood, 25 T.C. 468, 473 (1955). Weighed against the guidelines used to determine whether a taxpayer is engaged in a trade or business of selling real property, we conclude that petitioners were not engaged in this business. While the properties sold by petitioners were quite valuable, there were only a few sales of timberland properties made by petitioners over a 10-year period. Some of these so-called *347 sales were transactions between Eubanks and petitioners under contracts which dealt in detail with the cutting of the timber on the lands. Petitioners in some instances repossessed lands sold to Eubanks and later transferred the lands back to him. Not only does the record show that the sales were not numerous and many were made to Eubanks, it also shows that petitioners were attempting to arrange timber cutting operations on their land throughout at least the year 1958. The record has many indications that petitioners were engaged in the trade or business of selling timber, but not timberlands. Petitioners, from the time they came to Mississippi until they sold their timberlands out of necessity in 1951, were engaged in sawmill operations and may have been engaged in this business thereafter. In 1953 after acquiring lands in Arkansas petitioners were making definite plans to commence cutting timber on those lands through two operating companies incorporated in Delaware the stock of which they owned. Although these plans did not materialize, in 1957 petitioners were planning to have the timber cut from their timberlands to be used in a sawmill operation of Delta, a corporation owned *348 by their children. This operation did not prove successful for Delta. However, petitioners' transactions with Delta are indicative of their efforts to cut the timber or have it cut from their timberlands. In 1955 and 1956 petitioners entered timber-cutting contracts with respect to timber rights they had purchased and, although the operation resulted in a loss, it nevertheless indicates the business operation in which petitioners were engaged. The fact that petitioners' sale of the Arkansas properties to Eubanks occurred after the operations of Delta had terminated unsuccessfully is a further indication that petitioners' business was that of acquiring timberlands and standing timber for the purpose of cutting it or having it cut as distinguished from acquiring such timberlands for resale to customers in the ordinary course of a trade or business. Respondent in recomputing the loss reported by petitioners on their income tax return for 1957 and reducing that loss from the $199,915.12, shown on the return to $56,329.91 treated petitioners' sale of timberlands as being "section 1231 transactions." The Claiborne County property which petitioners sold in 1957 was part of the "Waterloo *349 Farm" located in Mississippi which consisted of farmlands, dairy lands and timberlands, as shown both by petitioners' return and respondent's redetermination of petitioners' taxable income for 1957. Respondent in computing the basis of the timber on petitioners' North Carolina property which was destroyed by fire in 1957 treated this property as property used in a trade or business and the timber as being held for sale in petitioners' trade or business. The same is true with respect to respondent's treatment of the depreciation deduction for 1957 on the draglines used to improve petitioners' North Carolina property. Of course, the North Carolina property could be considered to be property used in petitioners' trade or business in 1957 but because of a change in the purpose for which it was held became property held for sale to petitioners' customers in the ordinary course of their trade or business in 1958 if the facts herein supported such a conclusion. They do not. Petitioners sold the property in 1958 because the expense of holding it was becoming burdensome to them and someone approached them wanting to buy the property. Petitioners did not seek out or solicit prospective purchasers *350 for their timberlands. Petitioners never held themselves out as dealers in timberlands or advertised any timberlands for sale. They made consistent efforts to continue in the business of selling or cutting timber. Upon consideration of all the evidence of record we hold that petitioners were not engaged in the trade or business of selling timberlands in 1958, 1959, and 1960. Bad Debt Deduction in 1959 of the $46,000 Eubanks Loan Whether or not petitioners are entitled to deduct as a business bad debt the $46,000 portion of the loan to Eubanks which became uncollectible in 1959 is a question of fact. At the trial respondent specifically stated that he did not question the fact that petitioners sustained a $46,000 bad debt loss in 1959 with respect to this loan but did contend that the bad debt was a nonbusiness bad debt. Whether a debt is a business or nonbusiness debt depends on whether the loan was proximately related to the trade or business of the taxpayer. Whipple v. United States, 373 U.S. 193 (1963). The record as a whole shows that petitioners were in the business of selling timber or having timber cut for them under timber-cutting contracts. *351 Petitioners' deed to Eubanks of the Arkansas property in 1958 and the original mortgage given by Eubanks to petitioners on this property contained detailed provisions with respect to the cutting of timber and the payments to be made to petitioners as the timber was cut. These provisions which we have set forth in our findings were not just the ordinary no-waste provisions which might be expected in mortgages on timberlands but were provisions similar to those in timber-cutting contracts. On July 8, 1958, when petitioners loaned the $50,000 to Eubanks to assist Eubanks in putting his sawmill into operation, petitioners had already sold Eubanks the Arkansas land under a deed which indicates that the land was to be paid for from the cutting of the timber. The situation here is entirely different from that with respect to the loss from the guarantee of the Delta loan to Wells. The evidence with respect to that claimed loss was not sufficient to negate the fact that petitioners might have guaranteed the loan because of the corporation's being owned by their children and also the loss there resulted from a guarantee of a corporate loan. While the record is not as clear as it might be *352 as to the relationship between Eubanks and petitioners, it is clear that the relationship was a business one and not a personal relationship. We conclude that respondent erred in disallowing the $46,000 claimed by petitioners as a bad debt deduction in 1959 because of the worthlessness of their loan to Eubanks to that extent. The Additional Collection of $397,000 in 1959 on the Togo Island and Arkansas Tracts In 1959 when Eubanks, with petitioners' assistance, refinanced the Togo Island and Arkansas tracts, part of the proceeds of the loan that Eubanks received from Connecticut General was used to pay off the first mortgage on the Arkansas tract which secured a note given by petitioners to Connecticut General in August 1957 for amounts which petitioners borrowed at that time from Connecticut General. This first mortgage in the original amount of $425,000, with a then outstanding balance of $397,000, was also a second mortgage on the North Carolina tract and it had been assumed by the Powe group in 1958. When funds lent to Eubanks were used to pay off this mortgage, it was obviously not the intention of anyone to relieve the Powe group of payment of this portion of the purchase *353 price of the North Carolina lands and therefore as part of the arrangements, the Powe group increased the amount of their note to petitioners by the amount of $397,000. Respondent takes the position that since petitioners were still primarily liable on the mortgage to Connecticut General for $397,000 when it was discharged, petitioners received income to this extent from the cancellation of indebtedness. Petitioners take the position that since the payment of this indebtedness was to be made by the Powe group pursuant to their assumption of the indebtedness in 1958, petitioners received no income from the cancellation of indebtedness but merely effected a rearrangement of the method of payment of the purchase price of the North Carolina tract. It is difficult to discern from the record the exact understanding of the parties in connection with the refinancing in 1959 of the properties petitioners had sold to Eubanks in 1958. Our best interpretation of the facts is that Eubanks used his funds by way of loans from Connecticut General to pay a mortgage, payment of which had been assumed by the Powe group, with the understanding that the Powe group would give a note to petitioners for *354 the $397,000 so used as a payment of part of the purchase price of the Togo Island and Arkansas tracts. Even though the note was from the Powe group it was given by that group to petitioners because Eubanks had paid to that extent an obligation of the Powe group. Eubanks had no interest in the North Carolina tract but only in the Arkansas and Togo Island tracts. Viewed in this manner petitioners received property other than indebtedness of the purchasers of the Togo Island and Arkansas tracts as a part of the payment of the purchase price of such tracts when they received the new Powe group note increased by $397,000. Such property is to be considered as payment on the purchase price of the Togo Island and Arkansas tracts in 1959, to the extent of fair market value of the note which, insofar as the record here shows, is the face value thereof of $397,000. The confusion in the situation here is caused by the fact that the persons whose note petitioners received in 1959 as a partial payment on the Arkansas and Togo Island tracts happened to be the same individuals to whom petitioners had sold, in 1958, the North Carolina tract and who had a note outstanding to petitioners in recognition *355 of their indebtedness to petitioners for a portion of the purchase price of the North Carolina tract. This coincidence of fact does not cause the $397,000 increase in the note given by the Powe group to petitioners to be in any manner a payment by the Powe group on the North Carolina tract. The confusion occasioned by the identity of the parties purchasing the North Carolina tract and giving to petitioners their note in payment of a part of Eubanks' obligation to petitioners in return for Eubanks' paying a mortgage which those parties had assumed does not change the legal consequences. Respondent in his brief makes some statement to the effect that if the $397,000 is to be considered as payment on the Arkansas and Togo Island tracts in 1959, the profit percentage on the North Carolina tract must be recomputed. In figuring the profit percentage in 1958, the contract price of the North Carolina tract was computed by reducing the selling price by mortgages assumed, including the mortgage (second on the North Carolina tract) paid by Eubanks in 1959. Respondent does not suggest how such recomputation of the profit percentage can properly be made. In our view, since the $397,000 note *356 is includable in petitioners' income in 1959 as a receipt on the purchase price of the Togo Island and Arkansas tracts, it is not necessary to recompute the profit percentage on the North Carolina tract. When the contract price of the North Carolina property was reduced by the second mortgage thereon assumed by the Powe group, the result was in effect to consider a part of each payment on the Powe group note to petitioners to be profit from payments being made by the Powe group on the mortgage. When this mortgage was paid off in full petitioners received no payment on the North Carolina property which had not already been considered in determining the profit from that sale. When petitioners received the note as payment on the Togo Island and Arkansas properties, it was includable in full in their income in the year it was received, 1959. Therefore, no payments of principal by the Powe group on this $397,000 portion of the Powe note to petitioners should be included in petitioners' income. When the Powe group's note to petitioners was increased, the annual principal payments on the note were increased from $156,000 to $175,000. It is therefore a fair assumption that $19,000 was the *357 annual principal payment on the new note applicable to the $397,000 increase. Therefore, petitioners' receipts from the sale of the North Carolina property in 1960 should be reduced by the amount of $19,000 which was paid on the $397,000 portion of the note and any payments in any subsequent years on this portion of the note should not be considered as part of the payments on the North Carolina property. We view the question here as purely a factual question of how the transaction is viewed and not as raising any question of law and have reached our conclusions entirely upon our view of the proper interpretation of the facts. Gain on Repossession of Togo Island, Arkansas and Avoyelles Parish Properties in 1960 Petitioners take the position that under respondent's own regulations where there is a default in payment of an installment obligation for real property and the property is repossessed, the fair market value of the property repossessed is the purchase or bid price of that property. Respondent's regulations under section 453(b) dealing with income from the sale of real property being reported on the installment basis provide that where the purchaser of such property defaults *358 in his payment and the vendor reacquires the property, gain or loss is to be measured by the difference between the fair market value of the property at the date of reacquisition and the basis in the hands of the vendor of the obligations of the purchaser which are so satisfied, discharged, or applied, with proper adjustment for any other amounts realized or costs incurred in connection with the reacquisition. Section 1.453-5(b), Income Tax Regulations, contains the following statement: * * * If the property reacquired is bid in by the vendor at a foreclosure sale, the fair market value of the property shall be presumed to be the purchase or bid price thereof in the absence of clear and convincing proof to the contrary. * * * We have recognized that a taxpayer may realize a gain upon repossession of real property which has been the subject of an installment sale. Lucille L. Morrison, 12 T.C. 1178 (1949). In so holding we stated at page 1183: In general support of their contention, petitioners assert that the Commissioner in effect has determined a gain on the acquisition of property, using fair market value as the measure of receipt, while tax is laid on profit *359 from a disposition. But clearly the Commissioner has not done so. Under the governing regulations, which a taxpayer of necessity accepts in electing use of the installment basis, petitioners' lots are considered as sold when the contract is signed, regardless of contractual provisions which might technically postpone consummation of the sale. And, analogously, where the purchaser lost his rights under the contract by default and petitioners reacquired possession of the lot, they are deemed to have exchanged the purchaser's agreement to pay specified installments, receiving the lot in consideration therefor. The resulting gain is thus derived from a disposition of the customer's agreement to pay installments, and by the regulations its basis to petitioners is the excess of face value over the income returnable if the installments had been paid in full, while the amount received therefor is the fair market value of the lot. Respondent does not argue that the provisions of his regulations that if the property reacquired is bid in by the vendor at a foreclosure sale, the fair market value of the property shall be the bid price in the absence of clear and convincing proof to the contrary *360 are invalid. Apparently respondent as well as petitioners rely on this provision of the regulations. Respondent asserts that he has offered clear and convincing evidence of the fair market value of the three properties. The major difference between the parties centers on whether there is clear and convincing proof in this case that the fair market value of the properties which petitioners bought in at the foreclosure sales in 1960 is other than the amount of the bid price. The other question with respect to the amount of gain, if any, on the repossession of these properties is the amount of unrecovered basis petitioners have in the installment obligations. Since we have disposed of the unsettled issues between the parties in regard to this question it becomes a matter of computation in accordance with our determination and adjustments to which the parties have agreed. Respondent's entire argument in his original brief as to the establishment of a fair market value of the Togo Island and Arkansas tracts in excess of the bid price is contained in one paragraph which is followed by a paragraph stating that petitioners offered no independent appraisal testimony to refute the testimony *361 of respondent's evaluation expert. The one paragraph dealing with the testimony of respondent's expert is as follows: The respondent through expert testimony has established a fair market value considerably in excess of the bid-in price. With respect to the Arkansas tract and the Stewart tract, comprising approximately 36,000 acres, the respondent determined a value of $50.00 per acre, with a total value of $1,800,000.00. With respect to the Pickthorne lease, the respondent determined a value of $40.00 an acre; that lease comprises 4,000 acres of land, resulting in a total determined value of $160,000.00. Finally, as to the Togo Island tract, the respondent determined a per acre value of $40.00 based on the deed described acreage of 6,740 acres, for a total value with respect to the Togo Island tract of $269,600.00. The value of 6,100 acres of Togo Island located in Louisiana, that is, deed described acres, would be $244,000.00, leaving a value for the Mississippi portion of $25,600.00. The total fair market value of the Arkansas properties (including the Stewart acreage and the Pickthorn [Pickthorne] lease) and the Mississippi portion of Togo Island was, as of the date of foreclosure, *362 $1,985,600.00. When the testimony of the witness offered by respondent as his expert is analyzed, it is understandable why respondent makes no further argument. Respondent's expert testified that he was requested to make a valuation as of July and August 1960 of approximately 36,000 acres of timberland located in the State of Arkansas which was the Arkansas portion of the land which petitioner repossessed in mid-1960. He stated that in making the examination he went to Meridan, Mississippi, and discussed the matter with revenue agents and representatives of petitioner and inquired as to the availability of a timber cruise of the property, but that no inventory or cruise of the timber on this property was made available to him. He therefore determined, together with another engineer for the Internal Revenue Service who was working with him, to make a "Market approach" appraisal. He observed maps of the property and approached the property at some points to view the land to determine whether it was hardwood land and whether it had been cut over recently. He concluded from this meager observation that these Arkansas lands were comparable to lands of the Woods Lumber Company which had *363 been sold in the year 1960. He had previously examined the approximate 26,000 acres involved in the Woods Lumber Company tract and considered it comparable since it was bottom land near a river and was located in the same general area as petitioners' land. On the basis of a valuation of the Woods Lumber Company land and subsequent sales of lands by petitioners, he made his appraisal. In making this appraisal he took into consideration no other factors, giving the explanation, "Since there were no other methods of evaluation available to me, I used comparable sale - that approach." With this recitation he gave as his opinion a value $50of per acre for the Arkansas tract and $40 per acre for the Pickthorne lease. When asked to be more specific as to the portion of the Arkansas lands onto which he went, this witness in effect stated that he went by the borders of the lands which were on roads walking into the land at several places but that there was a large portion of the land located between the Cache River and the White River that he was not able to see except from across the river. This limited physical inspection was made in May 1964, of the approximate 40,000 acres which the witness *364 was evaluating. His testimony was that he saw approximately 5 percent of the land but that he considered this 5 percent a representative sample. Respondent's expert witness chose his particular method of valuing the Pickthorne lease at $40 per acre because petitioner did not own the fee and he considered that, having used $50 per acre for the land where petitioner owned the fee, he should use $40 for the lease. He stated that, since he used a comparable sales basis, he actually made no appraisal of the land and timber separately. This witness also stated that he had not made the Woods Lumber Company valuation on which he primarily relied in valuing the Arkansas tract but that this valuation had been made by another employee of respondent. The witness stated that the Woods Lumber Company property contained a mill and equipment which had been appraised and deducted from the total appraised value of the tract including the mill. The witness divided the appraised value of the Woods Lumber Company land as so computed by the number of acres in the tract with a resultant value per acre of $49.43 which he rounded to a value of $50 per acre for petitioners' land. The appraisal which respondent's *365 expert witness had seen of the Woods Lumber Company land and which he used in valuing petitioners' land had been used by him to arrive at an agreement as to the amount of depletion with a taxpayer unrelated to petitioners. The witness did not know the details of the sale of the Woods Lumber Company tract and produced nothing to show that such a sale had been made. The witness did not know how the valuation of the land in the Woods Lumber Company tract on which he relied had been made except from a statement of the method used made by another person. He could not recall the dominant species of timber on the Woods Lumber Company tract and he did not know how many acres of that tract had been cut over. This is the testimony which respondent contends is clear and convincing evidence of the value of the timberland in July 1960. A mere recitation of the statements by respondent's witness shows that his testimony is of little value. To an appreciable extent it was based on an appraisal which he did not make, and it was founded on an assumption of comparability of two parcels of land with no showing of any actual comparability. To the extent that it was based on subsequent sales by petitioners *366 of the same land it is equally unfounded since no details of the resale by petitioners to Eubanks in 1961 are shown, and the property was repossessed within the year of the resale. The only evidence of such sale is a very limited stipulation of the parties. The stipulation is that the consideration stated in the deed transferring the properties to Eubanks in 1961 was $2,500,000. The inference is that there was another consideration involved and the timber cutting provisions contained in other deeds of petitioners to Eubanks support the inference which the limited stipulations give. No details of a 1964 sale of the Arkansas properties are in the record and the date is too remote to be of help in determining the fair market value of the property in 1960 without any such details. The Togo Island valuation, as respondent himself points out, is based on a valuation of 6,740 acres, whereas the 6,100 acres located in Louisiana were not foreclosed in 1960 but in 1961. For this reason, as well as the lack of any factual basis for such evaluation in the record, we conclude that there is no clear and convincing proof that the fair market value of this property in 1960 when petitioners bid it *367 in at a foreclosure sale was other than the bid price. We conclude that the evidence is insufficient to establish the fair market value of the Arkansas and Togo Island properties in August 1960 when petitioners repossessed themm at the foreclosure sales and therefore under respondent's regulations the bid price is to be considered as the fair market value. Respondent relied for proof of the fair market value of the Avoyelles Parish property on the sale to the State of Louisiana in 1963 or 1964 of property adjoining this property and a sale by petitioners of this property in 1963. The sale of the adjoining property was at a price of $29 per acre and the sale made by petitioners of this property in 1963 was for a total price of $1,200,000. The transaction which resulted in this sale had originated as a timber purchase. The record also shows that the property adjoining petitioners' Avoyelles Parish land which was sold in 1963 or 1964 for $29 per acre had been purchased by the then vendors in 1958 for $1 per acre. Again, we conclude that the evidence in the record is not clear and convincing proof of a fair market value of the property different from the bid price. In the case of the *368 Avoyelles Parish land there is more information in the record with respect to how the $400,000 bid price might have been determined by petitioners. It appears that there was a mortgage of petitioners with an outstanding balance of $175,000 incumbering the property at the time of the foreclosure. An appraiser selected by the Sheriff appraised the land at $575,000. Petitioners' representative at the sale of the Avoyelles Parish land had arrived at the price he bid by asking some local people what bid would be required to obtain the property. It appears to be more than coincidence that the $400,000 price which petitioners' representative at the sale bid for the land plus the amount of $175,000 outstanding on the mortgage encumbering the land equals exactly the appraised value of the land determined by the appraiser selected by the sheriff. We conclude that respondent was in error in determining that petitioner realized a gain of $445,411.14 on the foreclosure in 1960 on the Togo Island, Arkansas, and Avoyelles Parish tracts but that the gain, if any, must be computed by using as the fair market value of the properties, the bid prices thereof at the foreclosure sales. Deduction of Interest *369 and Expenses in 1960 On August 2, 1960, subsequent to the commencement of foreclosure proceedings by petitioners against Eubanks in Arkansas but prior to the time petitioners bid in the Mississippi and Arkansas properties at the sale on August 5 in Mississippi and August 27, 1960 in Arkansas, petitioners paid $128,787.15 to Connecticut General. This payment included $48,419.08 of interest and $2,966.28 reimbursement of expenditures by Connecticut General for Eubanks. The amounts were claimed by petitioners as deductions in their 1960 income tax returns as interest and expenses paid. Respondent disallowed these deductions, but increased petitioners' basis in the property by these amounts as well as the principal payment on the note in computing the gain on petitioners' foreclosures of the properties. Respondent in his brief states that it is well established that an interest payment on another's debt is not deductible, citing Orange Securities Corporation, 45 B.T.A. 24 (1941), affd. 131 F. 2d 662 (C.A. 5, 1942); Chester A. Sheppard, 37 B.T.A. 279 (1938); and *370 Inez H. Brown, 1 T.C. 225 (1942). Petitioners argue that they had commenced foreclosure of the Arkansas properties prior to the date of the payment so that at the date of the payment the obligation on the mortgage had been assumed by them. The facts do not support petitioners' position. The decree entered on July 12, 1960, in Arkansas adjudged the amount by which Eubanks was indebted to petitioners and that Eubanks was in default and ordered that Eubanks pay petitioners and if payment were not made by Eubanks within 10 days that the property would be sold at public auction. The sale was held on August 5, 1960. No court order was obtained with respect to the Claiborne County, Mississippi segment of the Togo Island property because it was not necessary under the deed of trust, but the trustee held a public sale on August 5, 1960, and gave his deed to the properties to petitioners on the same day. Therefore, on August 2, 1960, the foreclosure sales at which petitioners bid in these properties had not been held. As of August 2, 1960, the debt was a lien on properties which petitioners did not own but on which they merely held mortgages. *371 Often a purchaser of property pays a preexisting debt on the property in order to obtain a clear title. Generally, such payments are considered as a part of the cost of the property to the purchaser. See Pancoast Hotel Co., 2 T.C. 362, 367-368 (1943). Cf. Norman Cooledge, 40 B.T.A. 1325 (1939). Petitioners in the instant case have shown no facts which distinguish the $48,419.08 and $2,966.28 payments from any other type of payment in connection with the acquisition of property such as past due taxes or other liens on the property. Under the facts here shown we sustain respondent's disallowance of petitioners' claimed $48,419.08 interest deduction and $2,966.28 expense deduction. 1957 Net Operating Loss Carryback to 1956 The amount of the net operating loss, if any, which petitioners incurred in 1957 is a matter of computation to be made from the agreed adjustments for the year 1957 and the determinations we have made herein of the issues presented for that year. Section 172(c) defines net operating loss for any taxable year ending after December 31, 1953, as the excess of the deductions allowed for income tax purposes over the gross income computed *372 with the modifications specified in subsection (d)(2). Section 172(d)(2) provides that in computing the net operating loss of a taxpayer other than a corporation the deduction for long-term capital gains allowed under section 1202 shall not be allowed. The parties do not appear to disagree as to the amounts of petitioners' capital gains for 1957 and therefore only the mechanics of the computation appear to be necessary. Respondent's entire argument with respect to this issue consists of the statement in his brief that "Petitioners had adjusted capital gains of over $446,836.34 in their taxable year 1956. In order to be entitled to a net operating loss deduction in the year 1956, the petitioners would have to overcome a capital gain adjustment under section 172(d)(2) of $223,418.17 in that year. On the basis of the issues raised in this proceeding, it would appear to be an impossibility for the petitioners to have sustained losses sufficient to overcome this adjustment." Petitioners make no reply to the above statement by respondent. The Court infers from the briefs of the parties that there is no disagreement between them as to how carrybacks to 1956 should be computed and applied *373 other than the substantive issues raised as to certain amounts of deductions in the year 1957. We have disposed of the issues which should enable the parties to make a proper computation of petitioners' net operating loss carryback from 1957, if any, and apply it to the taxable income for 1956 recomputed in accordance with our disposition of the issues herein for that year. Decision will be entered under Rule 50. Footnotes
1. The parties refer to this issue as also being present in 1960 but from the deficiency notice and pleadings it does not appear that any sales were made in that year. Therefore, if the issue is present, it is only with respect to collections, if any, on prior sales.↩
2. At the trial respondent questioned whether the income tax returns for 1955, 1956, 1957, and 1960 were in fact joint returns but on brief stated that he now agrees the returns for these years were joint returns.↩
3. It appears that petitioner may have been engaged in sawmill operations through at least the year 1956. Although we do not find facts in the record to show the date he discontinued his sawmill operations, there is an indication from the evidence that he still owned a sawmill in 1956 and that some of the machinery from this mill might have been used in building the Delta Hardwood Lumber Company sawmill. In the case of Broadhead v. Stone, 58 So. 2d 803 (S. C.Miss., 1952), the following statement appears at page 810: * * * Petitioner, voluntarily and not knowing of the recommendation discussed herein and not knowing of the erroneous information on which Defendant was acting filed his return of net income for the year 1950 and, on the very first sheet attached to that return as a schedule, made this statement to Defendant, "'* * * taxpayer has executed agreement to sell the bulk of timber holdings, and buy back the timber for mill operations, as the same may be cut during a period of five years from date of sale. The year of sale, if the same be accomplished, will be 1951; * * *'" [2] The foregoing allegation of the petition is wholly undenied, and is therefore admitted by the answer of the defendant. Section 1291, Code of 1942.↩
1. Partial sale of tract. Waterloo Dairy consisted of agricultural land as well as timberlands.↩
1. In the case of a deed of trust, these columns refer to the grantor and beneficiary.↩
1. No delay rental provisions are contained in these leases. ↩
2. Respondent disallowed only $9,270.07 of this amount.↩
4. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION. (a) General Rule. - In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate.↩
5. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business; or (2) of property held for the production of income.↩
6. The parties do not explain why this issue is not involved in determining the proper amount of net operating loss, if any, sustained in 1957, but again we will accept the issue as framed by the parties.↩
7. SEC. 166. BAD DEBTS. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
8. SEC. 1221. CAPITAL ASSET DEFINED. For purpose of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; * * *↩